[No. 28523. *En Banc.* April 19, 1943.]

J. W. HENDRICKSON, *Appellant,* v. UNION PACIFIC RAIL-
ROAD COMPANY *et al., Respondents.*[1]

[1]Reported in 136. P. (2d) 438.

*J. M. Ponder* and *J. H. Jahnke,* for appellant.

*Roy F. Shields* and *Hayden, Merritt, Summers & Bucey,* for respondents.

GRADY, J.—J. W. Hendrickson brought this action against the Union Pacific Railroad Company and Frank L. Blankenship and Claude Sweem, the conductor and engineer, respectively, of the train involved, to recover damages for injuries sustained by him as the result of coming in contact with one of its trains. At the close of the evidence submitted by the plaintiff its sufficiency was challenged by the defendants, which challenge was sustained. The plaintiff filed a motion for a new trial which the court denied. Judgment of dismissal was entered, from which this appeal is taken.

The challenge to the sufficiency of the evidence made by the defendants was twofold: (1) That no act of negligence on the part of any of the defendants was shown; and (2) that the evidence submitted by the plaintiff established that acts of negligence on his part contributed to, and in fact caused, the injuries sustained by him. The oral decision of the trial judge assumed that there was some evidence tending to show negligence on the part of the defendants, but he based his ruling on the contributory negligence of the plaintiff. The judgment of dismissal is general, and, as both grounds for dismissal are urged in support of the judgment, we shall review them both.

In reviewing a judgment of dismissal of this kind and in determining whether there is any evidence of the negligence of a defendant to be submitted to the jury, or whether the evidence of a plaintiff shows conclusively that he was guilty of such contributory negligence as will bar a recovery, it is incumbent upon us to have in mind the rules announced in *Lindberg v. Steele,* 5 Wn. (2d) 54, 104 P. (2d) 940:

"A challenge to the sufficiency of the evidence, or a motion for nonsuit, admits the truth of the plaintiff's evidence and all inferences that reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the defendant, and in the light most favorable to plaintiff. [Citing cases.]

"In the determination of such challenge or motion, even though the plaintiff's evidence is in some respects unfavorable to her, she is not bound by the unfavorable portion of such evidence, but is entitled to have her case submitted to the jury on the basis of the evidence which is most favorable to her contention. [Citing cases.]"

The material facts, so far as are necessary for our consideration of this case, are substantially as follows: The main line of the respondent railroad company runs in a northeasterly direction out of Centralia. Two miles north of Centralia there is a branch line running from Wabash junction on the main line to a place called Tono. A highway runs north from Centralia, crosses the main line and, at about two thousand feet beyond, crosses the branch line. Both crossings are at grade. There is considerable traffic over the highway, but the branch line was used infrequently. The appellant had never seen a train at the branch crossing, although he had traveled the highway often for several years in going to and from his home. There were signals at the main line crossing, but none at the branch line crossing.

On November 2, 1940, at 5: 35 p. m., a train, consisting of a locomotive, twenty-three empty gondola cars, and a caboose, left Centralia for Tono. Each gondola car is forty feet long. The distance from the bottom of the bed to the railroad rails is thirty-one inches, and the sides are at least six. and a half feet high. The gondolas are painted black. Under the bed of each car are rods, air chambers, and cylinders.

As the train was proceeding along the branch line,

it was necessary for the conductor on the caboose to check the numbers of some cars on a siding, which were to be picked up on the return trip, and, finding it difficult to do so from the moving train, he caused a stop signal to be given. The train came to a stop, with the locomotive and three cars clear of the road and the fourth right on the road crossing. At the time, the head brakeman was standing between the gangway and the engine tank, and the rear brakeman was on the caboose. The conductor was on the ground at the rear of the caboose. There was a heavy fog in the area of the two crossings. No bell was rung or whistle sounded, as provided by Rem. Rev. Stat., § 2528 [P. C. § 9091]. There were no lights or other means of warning to the traveling public on the highway of the presence of the standing train. In what was estimated to be less than a minute after the train came to a stop, the collision hereinafter referred to occurred.

The appellant, driving a Ford sedan, with headlights and four-wheel brakes in good condition, left Centralia close to six o'clock in the afternoon. It was then dark and very foggy in patches, with the intensity increasing as he advanced. As he approached the main line crossing, he rolled the car window down, and, not hearing the signal bell and not seeing any lights, he crossed the track. He then proceeded slowly, driving on the right-hand side of the road by keeping his headlights tilted down so that he could see the vegetation along the road.

Plaintiff knew of the presence of the branch line crossing, but he was unable to tell at any time just how far it was ahead of him. He was looking for a train because he always took that precaution at all railroad crossings. He located a house, referred to as the shingle weaver's, by reason of its window lights, and he came almost to a stop. He knew this house was

about one hundred feet from the crossing. His left-hand car window was rolled down. He listened, but he did not hear the train or any bell or whistle, and did not see it. He had heard the sound of bells and whistles of trains on this track before this occasion, and both could be heard for quite a long distance. At this point, he had slowed down to about five miles an hour. He then proceeded as before. He estimated his speed had reached twelve to fifteen miles an hour, and, when about fifteen or twenty feet from the track, his lights shone sufficiently through the fog so that he saw the gondola standing across the road. He applied the brakes and he tried to swing his car to one side, but he could not prevent the collision.

It is not clear from the record just when the appellant rolled down the window of the car after he crossed the main line track, or if it had been rolled down again before he reached the shingle weaver's house. What effect a closed window would have on his ability to hear a bell or whistle of the approaching train, if either had been sounded, does not appear. Nor is it clear just the rate of speed at which appellant traveled after he crossed the main line track and until he reached a point within one hundred feet of the branch line crossing, but it may be inferred that it was quite slow in view of the darkness and the fog.

Applying the principles above referred to, we are of the opinion that there was sufficient evidence of negligence on the part of respondents to have justified the court submitting the case to the jury.

 It was the duty of respondents, when approaching the highway, to comply with Rem. Rev. Stat., § 2528, which is as follows:

"Every engineer driving a locomotive on any railway who shall fail to ring the bell or sound the whistle upon such locomotive, or cause the same to be rung or sounded at least eighty rods from any place where such

railway crosses a traveled road or street on the same level (except in cities), or to continue the ringing of such bell or sounding of such whistle until such locomotive shall have crossed such road or street, shall be guilty of misdemeanor."

A noncompliance with this statute is negligence. *McKinney v. Port Townsend & P. S. R. Co.*, 91 Wash. 387, 158 Pac. 107; *Cline v. Northern Pac. R. Co.*, 123 Wash. 86, 211 Pac. 878.

■ ■ The rights of a railroad company and the traveling public in the use of a highway at a grade crossing are reciprocal, except that the former has the superior right of passage. The railroad company, in the conduct of its ordinary business, has the right to stop its train across the highway and permit a car to remain thereon for a reasonable length of time, and, if there are no unusual circumstances, it is not chargeable with negligence if guards are not stationed, or lights or other signals are not placed, so as to warn travelers on the highway of the presence of the train or car thereon. The rule is based upon the idea that the presence of the train or car on the crossing is notice to a traveler on the highway, such as the driver of an automobile, of such obstruction, and that those in charge of the train have the right to assume, or are justified in assuming, that one driving an automobile at night will have such lights and drive at such rate of speed as will enable him to see such an obstruction and avoid a collision.

The rule is not absolute and unqualified under all circumstances, and the railroad company may be found to be negligent in stopping and standing its train or car on a highway crossing without giving some kind of warning to the travelers thereon of the presence of the obstruction if it is found that its employees, in the exercise of reasonable care, would have known that,

on account of the darkness or fog, or both, the train or car upon the crossing was such an obstruction that the operator of an automobile properly equipped with lights, driving at a reasonable rate of speed and carefully operating the same and exercising ordinary care for his safety, would be liable to collide with it.

It must take into consideration atmospheric conditions, such as fog, the nature and extent of the darkness, the ability and likelihood of travelers to become aware of the obstruction, the nature and extent of the use of the highway by the public, the length of time the highway is to be obstructed, the infrequency of the use of the railroad and the passage of trains over the highway, the necessity for the stopping and standing on the highways, and, perhaps, other factors, according to the existing situation, and to exercise a measure of care and prudence commensurate with the dangers involved to warn the traveling public of the presence of the obstruction.

44 Am. Jur., Railroads, p. 740, § 501. *St. Louis-San Francisco R. Co. v. Guthrie,* 216 Ala. 613, 114 So. 215, 56 A. L. R. 1110; *Gage v. Boston & M. R. R.,* 77 N. H. 289, 90 Atl. 855, L. R. A. 1915A, 363; *Trask v. Boston & M. R. R.,* 219 Mass. 410, 106 N. E. 1022; *Richard v. Maine Central R. Co.,* 132 Me. 197, 168 Atl. 811; *Prescott v. Hines,* 114 S. C. 262, 103 S. E. 543; *Elliott v. Missouri Pac. R. Co.,* 227 Mo. App. 225, 52 S. W. (2d) 448; *Olson v. Denver & R. G. W. R. Co.,* 98 Utah 208, 98 P. (2d) · 944.

The foregoing cases and others on this branch of the law denying recovery have been decided from these viewpoints: (1) no negligence on the part of the railroad company or (2) that the presence of the train or car upon the crossing, whether moving or standing, in itself supersedes all other warnings and gives actual notice by its own presence, from which it follows (a)

that, in the absence of a statutory requirement, no duty is owing to the traveling public to further warn it of the presence of the train or car, and (b) that a traveler who runs into such a train or car is guilty of contributory negligence as a matter of law. Among the cases are included our cases of *Ullrich v. Columbia & Cowlitz R. Co.,* 189 Wash. 668, 66 P. (2d) 853; *Reines v. Chicago, M. St. P. & Pac. R. Co.,* 195 Wash. 146, 80 P. (2d) 406; and *Webb v. Oregon-Washington R. & N. Co.,* 195 Wash. 155, 80 P. (2d) 409.

One might infer from reading these cases, those cited therein and others, that, whenever a train or car, whether moving or standing, occupies a highway crossing, there can be no liability to the one who is using the highway and collides with the obstruction, because, in most of them, no exception to the rule adopted was suggested. But that such is not an unqualified rule is pointed out in *Schofield v. Northern Pac. R. Co.,* 4 Wn. (2d) 512, 104 P. (2d) 324, in which case it was said, p. 516:

"Many of the cases which hold that the railroad company was not liable as a matter of law, either because there was no negligence or because the driver of the colliding automobile was guilty of contributory negligence, call attention to the fact that there was nothing in those cases to indicate an unusual or extrahazardous situation, nor anything in the nature of a trap. The cases of [citations] are a few of the cases which recognize such a limitation upon the general rule. No case, so far as we are informed, holds that, where an automobile crashes into the side of a railroad train on a crossing, the railway company would not be liable under any and all circumstances."

On page 514, it is further stated:

"It is a general rule that, when a railroad train actually occupies a crossing, that in itself supersedes all other warnings and gives notice by its own presence [citing the *Reines* and *Webb* cases]. . . .

"There is an exception to the general rule where the situation is unusual or extrahazardous, or constitutes a situation in the nature of a trap."

Although the case of *St. Louis-San Francisco R. Co.*, *supra*, applies the general rule, it recognizes that a situation may arise where the rule does not apply, as it is said, p. 615:

"The rule sanctioned by the authorities to which we have referred is that, in order to charge the railroad with negligence in such a case, it must be shown that defendant's employees in charge of the train, in the exercise of reasonable care, ought to know that on account of darkness the cars upon the crossing are such an obstruction that people traveling along the highway in automobiles properly equipped with lights and carefully operated at a reasonable rate of speed would be likely to come into collision with them; in other words, the employees of the defendant, in the absence of some peculiar environment, are justified in believing that travelers in automobiles properly lighted and driving at reasonable speed will observe the cars upon the crossing in time to avoid coming into collision with them."

In 44 Am. Jur. 741, § 501, under the subject of railroads, the following statement is made:

"However, the railroad company's duty is not necessarily discharged under all circumstances if it fails to give warning in some form of the presence of the obstruction. The atmospheric conditions, obscurity and darkness of the crossing, the length of time it is obstructed, and the nature of the highway, may require that warning be given if the company is to be found in the exercise of due care, but in order to charge a railroad company with negligence in leaving an unlighted train across the highway in the night so as to make it liable for injury to an automobilist traveling on the highway running against it, the employees in charge of the train must, in the exercise of reasonable care, have knowledge that on account of the particular facts or situation involved people traveling along the

highway in automobiles properly equipped with lights, and carefully operated at reasonable speed, would be likely to come into collision with the cars unless lights are placed on them to warn of their presence."

In recognizing what may be said to be an exception to the general rule, some of the cases refer to "some peculiar environment," or "where the situation is unusual," or "extrahazardous," or "constitutes a situation in the nature of a trap," as a basis upon which to found liability or to excuse a claim of contributory negligence without defining or outlining what would constitute such a situation. The *Schofield* case indicates that the decision was based upon the "trap" doctrine, which arises out of a situation where certain factors or course of conduct misleads or deceives the user of the highway. Although the claim in this case is, to some extent, founded upon the trap doctrine, we do not think the evidence sustains this theory, but the question is whether, under all the facts and inferences to be drawn therefrom, the respondents were negligent in causing the train to enter and stand upon the highway crossing while the conductor secured the numbers of the cars standing on the siding; and that such negligence was the proximate cause of the injuries sustained by the appellant.

It seems to us that such a situation is here presented that a trier of fact might well find that it was unusual and extrahazardous, and even deceptive, and one created, in a great measure, by the respondents, or, at least, reasonable minds might differ thereon. A trier of fact might conclude that the respondents were negligent if it was found that no whistle was sounded or bell rung as the train approached the crossing, that it was not necessary for the train to occupy the crossing in order that the conductor secure the car numbers, and, in view of the darkness and the fog, the trainmen

should have realized that one driving an automobile along the highway at the proper speed, with proper lights and due regard for his own safety, might run into the train if it went onto the crossing and stood there.

We do not want to be understood from what has been said in this opinion that we are in anyway overruling or modifying any of our decisions on this subject, because we do not think this decision conflicts with them. We think they are not applicable to the factual situation presented by the record in this case.

■ The question of contributory negligence of appellant, as a matter of law, must next be considered. Many of the courts considering cases similar to this one have adopted the view that the actual occupancy of the crossing by a train in itself supersedes all other warnings and gives actual notice of its presence, and that the driver of an automobile must have such lights and drive at such speed, in view of existing conditions, as will enable him to become aware of the obstruction and avoid a collision; and, therefore, if he does collide with the obstruction, he is guilty of contributory negligence as a matter of law, and such negligence, as a matter of law, is the proximate cause of the collision. Our own cases have followed this general trend of authority. *Allison v. Chicago, Milwaukee & S. P. R. Co.,* 83 Wash. 591, 145 Pac. 608; *Keene v. Pacific Northwest Traction Co.,* 153 Wash. 310, 279 Pac. 756; *McFadden v. Northern Pac. R. Co.,* 157 Wash. 437, 289 Pac. 1; *Dumbolton v. Oregon-Washington R. & N. Co.,* 186 Wash. 433, 58 P. (2d) 806. Other cases might be cited, but we think these are sufficient to show the general rule which we have adopted.

Here, again, the impression might have been conveyed that this is a rule of universal application and admits of no exception, and that, when one collides

with a moving or standing train on a crossing, he is guilty of negligence as a matter of law. In the ordinary case, and particularly where the visibility is good, there can be no question about this, and reasonable minds cannot differ. In those cases where the visibility is poor the measure of care on the part of the user of the highway greatly increases, but we may have situations where reasonable minds might differ as to whether the user of the highway exercised the proper amount of care under the circumstances, and, in such case, the question becomes one for the jury.

Many of the cases do not make any distinction between standing and moving trains, but we believe there can be situations where such a distinction should be made. A driver of an automobile, when visibility is poor, is much more likely to become aware of the presence of a moving train on a crossing than a train or car standing thereon because of the attendant noise and the motion itself.

Another factor we think proper to consider is the frequency or infrequency that trains use the particular railroad track and known to the user of the highway. A trier of fact might well conclude that one should be held to a greater measure of care in his approach to a railroad track which is used frequently than one that is used infrequently and upon no fixed schedule.

We think, when our cases are critically examined, it will be found in each of them that the court considered the facts were such that there was no room for a difference of opinion, and that the court did not intend to convey the idea that an absolute rule applicable to all cases was being adopted. We believe that, under the factual situation we have set forth, it cannot be said, as a matter of law, that the appellant was guilty of negligence which proximately contributed to

his injuries, and we are of the opinion that this question should have been submitted to the jury.

■ It is claimed, however, that the appellant violated the provisions of Rem. Rev. Stat., Vol. 7A, § 6360-104 [P. C. § 2696-862], which is as follows:

" . . . Any person operating any vehicle, other than those specially mentioned above [carriage for hire, school bus, or transporting explosive substances or inflammable liquids], shall, upon approaching the intersection of any public highway with railroad or interurban grade crossing, reduce the speed of such vehicle to a rate of speed not to exceed that at which, considering view along such track in both directions, such vehicle can be brought to a complete stop not less than ten (10) feet from the nearest track in the event of an approaching train. . . ."

At the trial, when testifying, the appellant attempted to make an estimate of his speed as he approached the crossing. He stated that he had slowed down to "maybe 5 miles an hour," and that just before the collision "I don't think I was traveling over 12 or 15 miles an hour." He estimated that, when he became conscious of the presence of the gondola on the crossing, it was something like twenty feet in front of him, but he was not sure whether it was more or less; that it was too close to enable him to stop at whatever speed he might have been going. He estimated that, if his speed were twenty miles an hour, he could have stopped in thirty-five feet, but he was unable to give an estimate of the distance he could have stopped at if he had been going ten miles an hour.

It will be observed that the statute provides a rule of conduct for one approaching an intersection in the event a train is also *approaching*. It is designed to prevent a collision between a train and a vehicle at an intersection and to require the driver of the vehicle to be in a position to stop within a certain distance when

he becomes aware that the train is approaching. It has nothing to do with the situation that exists after the train has gotten across the highway. In any event, the testimony above referred to, and it is the only testimony on that point in the record, is not sufficiently definite as to speed so that it can be said, as a matter of law, that the appellant violated the statute, and, if he did so, such violation was the proximate cause of the collision.

We are therefore of the opinion that the questions of negligence of respondents in approaching and standing on the crossing without adequate warning to appellant, the contributory negligence of appellant, and that of proximate cause, were for the jury, and that the court erred in dismissing the action.

The judgment is reversed, and the cause remanded to the lower court for a new trial.

SIMPSON, C. J., MILLARD, BLAKE, and MALLERY, JJ., concur.

ROBINSON, J. (dissenting)—While I think that no negligence was shown on the part of any of the defendants, I will not prolong this dissent—which will be necessarily long in any event—by discussing that feature of the case. Nor do I think it necessary to do so, since I am convinced that the trial court's ruling, that the plaintiff's own evidence established his contributory negligence, must be affirmed, unless we are prepared to ignore the great weight of authority throughout the courts of the country, overrule a number of our previous decisions, and abandon the reasoning of the opinions in which they were handed down. I think the majority opinion, though professing not to, does just that. At the very least, it begins a process of erosion, weakening the standards of care to be used in approaching a railroad grade crossing hitherto set

up by court decisions and statutes, and this, at a particularly unfortunate time. Joseph B. Eastman, Federal director of defense transportation, has recently reported that, despite the great curtailment of travel by automobile, about two thousand persons were killed, and four thousand six hundred injured, at railroad crossings in 1942, a considerable increase over 1941. I take it that the accident involved in this case was a grade crossing accident, although the appellant was not injured by a moving train, but by crashing into a standing one. It is a matter of common knowledge that a railroad grade crossing presents both dangers.

This is not a case where a judgment was entered notwithstanding the verdict of a jury, nor yet one where a decision was rendered after hearing the defendant's evidence. The trial judge was not called upon to resolve any conflicts in testimony, nor to deal with any disputed facts, nor did he presume to do so. He decided a pure question of law, just as a court does when it rules on a general demurrer for want of facts. In that case, the facts are fixed by what the plaintiff said in his complaint. In this, they were fixed by what the plaintiff said on oath while on the witness stand.

As the trial court, in ruling upon a general demurrer for want of facts, must give the allegations of the complaint every favorable intendment, so, here, as the majority have emphasized by a quotation from the case of *Lindberg v. Steele,* 5 Wn. (2d) 54, 104 P. (2d) 940, it was the duty of the trial court to give the plaintiff's evidence its most favorable interpretation. However, I do not understand the language of that case to mean that a downright admission can be whittled away. As illustrative of what I have in mind, I think that, the plaintiff having testified that he was practically stopped when opposite the shingle weaver's house, and, at another point, that he was then making

but five miles per hour, the second statement should be used in appraising his care or want of it, that statement being the most favorable to him under the facts of this case, as will later appear. But I do not think the rule stated in *Lindberg v. Steele* means that, in this case, the trial judge or the jury would have been warranted in coming to the conclusion arrived at by the majority and stated by them as follows:

"Plaintiff knew of the presence of the branch line crossing, but he was unable to tell at any time just how far it was ahead of him."

We will leave that matter to the appellant's evidence, which will be quoted rather extensively in order to avoid erroneous interpretations which are prone to creep in when the writer of an opinion attempts to state evidence in narrative form. Furthermore, since this evidence will not be quoted in the exact order given, but in a way that will tell the story of the collision in chronological order, reference will be made to the page and line in the statement of facts from which each detached quotation is made. All italics used are supplied.

There is much evidence in the record, and it is stressed in the majority opinion, to the effect that appellant used extreme care in negotiating the main line tracks which he crossed about two thousand feet before he came to the crossing where the collision occurred. It seems to me that this evidence has no substantial probative value. That a motorist scrupulously regarded a red light in crossing Fourth avenue does not even tend to prove that he did not run through the red light in the very next block. It is with the appellant's care or lack of it in approaching the crossing where the collision occurred that we are concerned, and the inquiry into that need not go further back than the "shingle weaver's house."

First, and by way of introduction, it should be pointed out that appellant was familiar with the highway, its surroundings, and conditions. He knew of the presence of the railroad tracks and the use that was made of them. He also knew that there was no bell or other signal there to indicate their location.

"Q. Of course, you have lived up there about five years and you know there is a railroad track there? A. I do. Q. And you know that sometimes trains do run up there? A. Yes. . . . [St. 40, line 9] Q. Of course, you had been driving over that crossing time and time again all the time you have lived up there? A. Yes. Q. Several times a week undoubtedly? A. Yes. . . . [St. 46, line 13] A. Indeed, I came up to that car. . . . There was no bell to see or hear . . . [St. 62, line 6]"

Second, he knew that there was danger in crossing.

"Q. And you know that trains do sometimes run up there? A. Yes. Q. And there is danger of crossing over there? A. Yes. . . . [St. 40, line 12] Q. . . . You didn't anticipate finding any train on that track, did you? A. *You never know*. . . . [St. 46, line 7] Q. You didn't expect to see one there, did you? A. Well, I slowed down right there and expected one any time." [St. 61, line 11]"

Third, he had come almost to a standstill (at one place, he says he had reduced his speed to five miles per hour) when he saw a light in the shingle weaver's house, and knew then just where the crossing was.

"Q. Now at the time you almost came to a standstill, you say near some shingle weaver's house, I want you to tell the jury now how far that is from the crossing where the accident occurred. A. A little over 100 feet, I believe; over 100 feet or more, something like that. . . . [St. 22, line 1] Q. You didn't anticipate finding any train on that track, did you? A. You never know. *I didn't know exactly where the tracks were exactly* until I came to the shingle weaver's house, then I knew just where I was. . . . [St. 46, line 7]"

Fourth, at that point, although driving in a heavy fog, he abandoned his former care and increased his five-mile pace to some speed unknown, but to such a rate that, although he saw the train at a distance of twenty feet, more or less, and applied his recently inspected four-wheel brakes, he could not avoid the collision or slow down to less than twelve or fifteen miles per hour.

"Q. . . . So I got my bearings and knew just about where it was, and when I came to the track there, that car—it was—I couldn't say exactly how close I was to it. I was maybe 15 or 20 feet. . . . [St. 22, line 12] Q. And about how far were you from the car when you first saw it? A. I don't exactly know. . . . I couldn't give the exact distance of that, maybe 20 feet. It may have been closer; it may have been farther. . . . [St. 49, line 14] Q. In any event it was too close to you to enable you to stop at whatever speed you were going? A. Yes, it was. [St. 49, line 20] *I don't think I was travelling over 12 or 15 miles an hour, I don't think, when I hit that car.* . . . [St. 24, line 22]"

The above is appellant's story in his own words. No testimony has been quoted other than his own. The trial judge was called upon to rule as to whether or not it showed that he was chargeable with negligence contributing to his injury. He held that it did. He was in duty bound to apply the former decisions of this court in deciding that question of law, and I think he correctly applied them.

It is said in the majority opinion, in that paragraph beginning the discussion of contributory negligence, that many courts, in considering cases similar to this, have adopted the view that the actual occupancy of the crossing by a train in itself supersedes all other warnings and gives actual notice of its presence, and the impression is given that we have employed that rule in holding drivers who run into the side of a train

at a grade crossing guilty of contributory negligence. The *McFadden* and *Dumbolton* cases, which will be discussed later in this opinion, are cited in that paragraph, and the paragraph closes with this sentence:

"Other cases might be cited, but we think these are sufficient to show the general rule which we have adopted."

I know of no case in which this court has ever employed that rule in holding a driver who ran into the side of a train guilty of contributory negligence, and, certainly, the *McFadden* and *Dumbolton* cases do not proceed on any such theory. In *McFadden v. Northern Pac. R. Co.*, 157 Wash. 437, 289 Pac. 1, the trial court, as in this, dismissed the cause when the plaintiff had rested, on the ground that it established his contributory negligence. The court said, in part:

"It is our opinion that the trial court did not err in its conclusion. It is no doubt true that a traveler upon a public highway, having no knowledge of its condition, other than that which is apparent to him, may use it in the ordinary and usual way in the faith and belief that no obstructions have been placed therein without adequate and sufficient warning of their presence. Hence, if he, while so using it, unknowingly approaches a railroad crossing at which a train is crossing, which is guarded with nothing more than the usual crossing signs, and the visibility is such that he cannot see it until he approaches so closely that he cannot avoid striking it, he might not be guilty of contributory negligence.

"But this was not the situation presented here. The person injured by colliding with the train was familiar with the highway and its surroundings and conditions. He knew of the presence of the railroad crossing, and knew, or was in duty bound to know, the uses that were made of it. He knew that there were no lights, bells, or warning signals of any kind to indicate the location of the crossing tracks, and knew that the tracks were continuously used. To pass over it when the visibility

was such that he could not see a train upon it until he was too close to it to avoid running against it, is, in this situation, such contributory negligence as will prevent a recovery. *Bowden v. Walla Valla Valley R. Co.,* 79 Wash. 184, 140 Pac. 549; *Benedict v. Hines,* 110 Wash. 338, 188 Pac. 512; *Miller v. Oregon-Washington R. & Nav. Co.,* 128 Wash. 292, 222 Pac. 475; *Keene v. Pacific Northwest Traction Co.,* 153 Wash. 310, 279 Pac. 756. As we said in the last cited case:

" 'There was, it is true, a fog, at the time, which more or less obscured his [the injured person's] vision, but this, instead of excusing him from exercising care and caution, rather added to his duty in that respect. If he could not see whether or not he was entering a zone of danger in venturing onto the railway track, it was his duty to take some other means of ascertaining the fact. He could not abandon all caution, take a chance on escaping injury, and, failing to escape, charge his delinquency to another.' "

In arguing the case at bar, appellant's counsel put a question to this general effect: What should, or could, my client have done that he did not do? The appropriate answer is made in the last of the three paragraphs above quoted.

The majority attempts to distinguish the *McFadden* case on the ground that the track involved in the case at bar was not "continuously used" and the appellant had never seen a train on the crossing. But that is not a valid distinction. The question involved here is: Did the appellant, without due care, put himself in a place where he knew danger was to be apprehended? When asked if he anticipated the train might be there, he said: "You never know." In fact, he even said that "he expected one any time," though, in fairness, that should be interpreted as meaning merely that he realized that one might be there at any time.

In the case of *Dumbolton v. Oregon-Washington R. & N. Co.,* 186 Wash. 433, 58 P. (2d) 806, decided six

years after the *McFadden* case, this court, in a unanimous Department decision, disposed of the same contention which the majority now makes. In the *Dumbolton* case, as in the case at bar, the trial court held, upon a challenge at the close of the plaintiff's evidence, that plaintiff's own evidence showed that he had been guilty of contributory negligence, and dismissed the case. In a fog—the opinion says, "there was much fog"—the plaintiff, driving "at from twelve to fifteen miles per hour," ran into an engine on a switch track. He had driven over the particular portion of the highway in question "half a dozen times each day for about a week preceding the accident." On appeal, this court said, in part:

"Under the decisions of this court, it must be held, as matter of law, that appellant was guilty of such contributory negligence as bars any recovery on his part."

Various decisions were cited to sustain the holding, and the second of the paragraphs, which I have above quoted from the *McFadden* opinion, was quoted in support thereof. The appellant's contention that those cases were distinguishable on the ground that he had never seen a train on this track, was summarily disposed of by the court:

"While appellant testified that he had never seen any trains upon the switching tracks, *he knew that the tracks were there,* and, as we have repeatedly held, a railroad track is in itself a warning of danger." (Italics mine.)

The majority, nevertheless, say:

"We do not want to be understood from what has been said in this opinion that we are in any way overruling or modifying any of our decisions on this subject, because we do not think this decision conflicts with them."

With all due respect, I submit that their opinion does conflict with, and, in effect, does overrule, our

former decisions, and I further think it unfortunate that the majority does not frankly say so. As it is, the members of the bar will, of necessity, be left in doubt as to what the law is, and the trial judges who are bound to follow the decisions of this court, on ruling upon challenges to evidence and in framing instructions, will be in no better case.

I think also that the appellant was guilty of negligence *per se,* and that this was a proximate cause of the collision. Our legislature has passed many statutes designed to prevent grade crossing accidents, approaching the matter from two points of view. Since 1909, the railroad commission, or the successor to its powers and duties, has had the power to require any railroad to install signals at grade crossings. Rem. Rev. Stat., § 10513 [P. C. § 5640]. Later, the sawbuck sign law was passed, and the director of highways has been authorized to require the installation of additional devices. Rem. Rev. Stat., Vol. 7A, § 6400-49 [P. C. § 2696-570]. On the other hand, the legislature has also laid down rules to be followed by drivers of motor vehicles in approaching grade crossings. I quote a portion of chapter 189, Laws of 1937, § 104, p. 905, Rem. Rev. Stat., Vol. 7A, § 6360-104 [P. C. § 2696-862], emphasizing the material part by the use of italics:

"Any person operating any vehicle carrying passengers for hire or operating any school bus or operating any vehicle in which are being transported explosive substances or inflammable liquids shall bring such vehicle to a full stop within fifty (50) [feet], but not less than twenty (20) feet, of any railroad or interurban grade crossing before proceeding across the same. *Any person operating any vehicle, other than those specifically mentioned above, shall, upon approaching the intersection of any public highway with railroad or interurban grade crossing, reduce the speed of such vehicle to a rate of speed not to exceed that at which, considering view along such track in both direc-*

*tions, such vehicle can be brought to a complete stop not less than ten (10) feet from the nearest track in the event of an approaching train. . . ."*

Of this statute, the majority say:

"It will be observed that the statute provides a rule of conduct for one approaching an intersection in the event a train is also *approaching."*

I submit that it does not provide what a driver approaching a grade crossing shall do in the event a train is also approaching. It provides a rule of conduct for vehicle drivers in *approaching* a dangerous place, to wit, a railroad grade crossing. The rule it provides for drivers of common carrier vehicles, school busses, and vehicles carrying explosives or inflammable liquids, is that they

" . . . shall bring such vehicle to a full stop within fifty (50) [feet], but not less than twenty (20) feet, of any railroad or interurban grade crossing before proceeding across the same."

The obvious purpose of the rule is to absolutely insure that the driver of such a vehicle will, in every instance, come up to the track with his vehicle under control. He must stop, and, if he failed to do so and ran into a railroad car standing on the crossing, he would not be allowed to say that the statute applied only in the event that a train is approaching. The statute means that he shall make a full stop, even if there be no train within a mile, and, I may add, that that is, as every person knows, the interpretation made of the statute in actual practice.

For the drivers of other vehicles, a less stringent rule of conduct in approaching railroad grade crossings is provided. The statute provides that, in approaching a railroad grade crossing, they shall reduce their speed to a rate not to exceed that at which they can come to a complete stop not less than ten feet from the nearest

track. True, the statute adds, "in the event of an approaching train." That, in my opinion, is merely an explanatory phrase which does not condition the application of the statute. Is the statute only applicable in the event a train is approaching? Suppose, with his car not under the control provided by the statute, a driver crashes into the caboose or last car of a train which has all but cleared the intersection, can he escape negligence *per se* by saying: Why, that statute applies only in the event of an approaching train?

I believe that the statute can be fairly construed in the manner I have above indicated. I hope that, when the necessity for construing it arises, it will be so construed. It may be presumed that the legislative purpose in enacting the statute was to prevent such accidents as had previously been the subject of inquiry in the *McFadden, Dumbolton,* and many similar cases. In spite of the presumption that men will exercise ordinary care for their own safety, such accidents were, and are, continually occurring. To my mind, the statute makes obligatory a specific course of conduct for all vehicles in approaching railroad grade crossings, which, if complied with, will render such accidents extremely rare.

But whatever may be the correct interpretation of the statute, the appellant certainly violated the common-law standards of care set up in our former decisions. He was familiar with the highway. He knew that the crossing was one hundred feet ahead of him. He knew that a train might be approaching it or blocking his path. Yet, instead of maintaining his then cautious pace, he speeded up in that last hundred feet to such a point that, despite the use of his brakes at the last moment, he crashed into a train at a speed of at least twelve or fifteen miles per hour. As is said in the *McFadden* case in quoting from a still earlier decision:

" 'There was, it is true, a fog, at the time, which more or less obscured his [the injured person's] vision, but this, instead of excusing him from exercising care and caution, rather added to his duty in that respect.' "

I have felt it my duty to dissent as earnestly as I can from an opinion which so completely abandons the salutary standards set up by our predecessors in a case as similar to this case as one case can ever be to another.

BEALS, STEINERT, and JEFFERS, JJ., concur with ROBINSON, J.

