GREEN, ADM., ETC. *v.*
GULF, MOBILE & OHIO RAILROAD COMPANY

No. 42223          May 21, 1962          141 So. 2d 216

*Ben Stevens,* Hattiesburg; *Jesse M. Byrd,* Leakesville; *Barnett, Montgomery, McClintock & Cunningham,* Jackson, for appellant.

*Welch, Gibbes & Graves,* Laurel, for appellee.

KYLE, J.

The appellant, Gavin Green, Administrator of the Estate of Robert Bolton, deceased, filed his declaration in the Circuit Court of Greene County against the appellee, Gulf, Mobile & Ohio Railroad Company, for the recovery of damages under the wrongful death statute for the death of Robert Bolton, who was killed in an automobile accident which occurred on State Highway No. 59 on May 22, 1955, when the automobile in which he was riding collided with a railroad boxcar which blocked the railroad crossing at a point near McLain, in Greene County. The cause was heard at the May 1960 term of the court, and at the conclusion of the evidence the jury returned a verdict for the appellant in the amount of $9,500, and judgment was entered thereon. The appellee filed motions for a new trial and for a judgment notwithstanding the verdict, and after hearing arguments on the motion for judgment notwithstanding the verdict the court sustained the motion and set aside the judgment theretofore entered, and entered a judgment for the appellee. From that judgment the appellant has prosecuted this appeal.

The record shows that the accident occurred about 2:30 o'clock A. M. on the above mentioned date at a point on the above mentioned state highway near Greene County Vocational Colored School, approximately one mile southeast of McLain; and that the automobile in

which the plaintiff's intestate was riding was a Plymouth automobile owned and being driven by Arthur James Bryant. The general course of the highway in that vicinity was north and south, and the general course of appellee's railroad track was northwestwardly and southeastwardly. From the photographs offered in evidence by agreement of the parties it appears that the highway north of the crossing curved to the right as it approached the railroad crossing. The freight cars which blocked the crossing at the time of the collision constituted a part of a long freight train consisting of 159 freight cars and four diesel motor units enroute northward toward McLain and the town of Beaumont. There was a sharp conflict in the testimony offered on behalf of the appellant and the testimony offered on behalf of the appellee on the issue as to whether the train was moving at the time of the collision, or had stopped. The appellant's proof showed that the freight train had come to a stop, completely blocking the highway crossing for a considerable period of time before the accident occurred, and several of the freight cars and the caboose were south of the crossing, with no opening left for the passage of motor vehicles using the highway. It was also shown by the appellant's witnesses that no flagman was stationed at the crossing or north of the crossing to warn the deceased that the train had blocked the crossing. The appellee's witnesses testified that the train was still in motion at the time the accident occurred, and that the train came to a stop after the accident occurred. The evidence shows that the driver of the car and the appellant's intestate were both killed instantly as a result of the collision.

The appellant alleged in the first count of his declaration that the appellee knew or should have known that said highway was heavily traveled night and day; that the highway north of the crossing curved to the right as it approached the crossing; that the special

conditions at the crossing created a trap and an unusual special hazard which required that the appellee, in the exercise of ordinary care, give reasonable warning to the deceased of the presence of the appellee's train upon the crossing; that the conditions were such that the appellee knew or should have known by the use of reasonable care that persons, including the deceased, traveling on said highway at a reasonable rate of speed in an automobile equipped with brakes and lights, could not or might not be able to see the appellee's freight cars blocking the crossing in time to avoid a collision. The appellant also alleged that the atmosphere was foggy at the time the accident occurred, making the crossing more hazardous; that all of the above mentioned conditions combined created an unusually dangerous condition at the crossing; that the appellee was negligent in failing to maintain a flagman or provide some other warning system to warn travelers on the highway of the danger, in view of the special conditions above mentioned; and that the appellee's negligence, as set forth in the declaration, was the proximate cause of the collision.

In the second count of his declaration the appellant alleged that the defendant was negligent in stopping the freight cars connected with the train on the crossing, and in failing to uncouple the cars so as not to obstruct traffic on the highway for a period of time longer than five minutes, as required by Section 7780, Miss. Code of 1942, Rec.

The appellant's attorneys have assigned and argued only one point as ground for reversal of the judgment of the lower court, and that is, that the lower court erred in setting aside the verdict of the jury in favor of the appellant and entering judgment in favor of the appellee notwithstanding the verdict of the jury.

We think the court erred in sustaining the motion of the appellee for a judgment notwithstanding the verdict, and in entering a judgment in favor of the appellee.

■■ In considering the propriety of the action of the trial judge in sustaining the appellee's motion for a judgment notwithstanding the verdict, we must view the evidence in the light most favorable to the appellant, and treat as proved all material facts which the appellant's evidence established directly or by reasonable inference. Grice v. Central Electric Power Association, 230 Miss. 437, 92 So. 2d 837; and cases cited. See also Railway Express Agency, Inc., v. Mallory (C. C. A. 5th, 1948), 168 F. 2d 426.

The testimony offered on behalf of the appellant consisted mainly of the testimony of L. R. McMillan, who was principal of the Greene County Consolidated School at the time the accident occurred. McMillan testified that he resided on the school property during the 1958-1959 school year; that the school buildings were located on the west side of the highway about 75 yards from the railroad track; that he had attended the closing exercises of the school during the early part of the night of May 21; that it was about 11 o'clock P. M. when the crowd left the school building; and that he carried some of the children to their homes, but he was back at home on the school grounds by 12 o'clock. He stated that he was up constantly, however, during the night, and that he heard the freight train blow at the lower crossing where it blocked the road; that he was on an inspection round over the school grounds at that time to see that there were no trespassers on the school property; and when the train stopped he heard the engine blowing in town, as it was accustomed to do. He stated that a few minutes later he saw the lights of an automobile proceeding southwardly along the highway at a normal rate of speed; and he then heard a collision at the railroad crossing. That was

approximately 20 minutes after the train had come to a stop. There were no flashlights at the crossing; there were no bells ringing; and there was no flagman at the crossing.

McMillan stated that he was dressed in his night clothes and had his flashlight in one hand while he was walking over the school grounds, and after he heard the crash at the railroad crossing he went back into his house and put on his pants and went immediately to the scene of the accident. He stated that the train pulled up beyond the crossing just as he came up to the crossing. It was a long train, part of it being to the right of the crossing and part to the left of the crossing. He saw at once that the two boys who were riding in the car were dead. He recognized both boys. They had attended his school closing during the early part of the night. McMillan stated that the highway was a paved concrete highway that he had driven over many times; that there was a Mississippi Stop sign on the right side of the highway; that there was a curve in the highway as it approached the railroad crossing from the north 10 or 15 yards from the track; that the curve was to the right and it was a "pretty sharp curve." He stated that the railroad car with which the automobile collided was a gondola type car with no top on it; that the sides of the flat cars were of a dark color, and there were no lights of any kind on the cars which blocked the crossing. On cross-examination McMillan stated that he did not know who owned the automobile in which the boys were riding but Arthur Bryant was driving the car. He stated that the train was standing still when the automobile hit; and that his best judgment was that the accident occurred after one o'clock. On redirect examination McMillan stated that the reason for his making a sound of inspection of the school properties at such a late hour of the night was, that he had had trouble with people breaking and entering the

school buildings, that one man had been convicted of stealing from the school lunch room, and there had been several other breakins for the purpose of stealing school commodities and supplies.

The railroad witnesses testified that the train was moving at the time of the collision, and that the automobile in which the deceased was riding hit the ninth car from the rear of the 159-car train.

H. J. Allerton, engineer, testified that he drove over the crossing at a rate of speed of about 30 miles an hour, and he saw no vehicle or traffic on the highway at the crossing. The first traffic he observed was a Plymouth automobile about a mile north of the crossing. The automobile was traveling at a rate of speed of about 35 miles or more an hour. Allerton stated that he cleared the crossing by 6 or 8 cars before he came to a stop, and when he came to a stop he cut his engine from the train and went into Massey Spur for some wood. He first learned of the accident when a man on the caboose radioed him that someone had been hit, and that a doctor was needed. That was around 2:30 o'clock A. M. On cross-examination he stated that the railroad car that was hit was an empty gondola which was 9 cars from the caboose.

W. T. Powe, freight conductor, testified that he was riding on the west side of the trailing motor, the last of the four motor units which furnished the power for propelling the train, when the train reached McLain. That was up near the engine. A brakeman was with him. He saw no automobile at the crossing as the train passed over the crossing. He stated that the weather was clear; that the moon was shining, but there were pockets in spaces; that the train was made up of 159 cars; and that the average length of cars on a train of that kind was about 40 feet. He stated that he maintained communications with the rear end of the train by radio, and that he learned that there had been an

accident about 2:45 o'clock A. M. The flagman told him that they had hit something back there. The train had been stopped about 20 minutes when he learned of the accident. Powe stated that he went to the scene of the accident, and found one freight car off of the track, the 9th car from the caboose which was an empty gandola. There was no one at the junction at the time he went back there. The flagman was at the back end of the train. A. H. Ruffin, the brakeman, testified that he was riding on the left side of the trailing motor; that the train stopped at McLain and he cut off the engine from the train, and the engineer proceeded immediately to the Massey Spur; that the engineer came back about ten minutes later and told him that they had had an accident. On cross-examination Ruffin stated that at the time he heard of the accident he had cut the diesel units away from the 159 freight cars and had gone into the siding and was coupling up to more cars in the siding.

J. A. Coats, a brakeman or flagman, testified that he was riding in the caboose in the rear of the train, and when the caboose passed over the highway crossing he heard something scraping along the side. That was the first indication he had that something was wrong. After the train came to a stop north of the crossing he walked out on the rear platform of the caboose, and as soon as his eyes became accustomed to the darkness he could see smoke and dust going up from the crossing. He got his walking-talking radio and his light and some fuses and went back to the crossing to see what was wrong. He found an automobile that appeared to have been struck by the train or to have run into the train. It was just a pile of junk with two colored boys in it; both were dead. They appeared to have been killed instantly. He called the engineer on his radio and asked the engineer if they had hit an automobile back at the crossing. He was told that they had not. Coats

stated that, after he had notified the engineer of the accident, he went to a house near the crossing where some colored people lived and woke them up and asked if they would come out and see if they knew either one of the boys. He did not know whether those people came to the scene of the accident or not, but other people came up later and identified the two bodies.

Three witnesses were called to testify for the plaintiff in rebuttal. Willie Bush testified that he and his wife, Bertha, lived in the white house immediately south of the railroad crossing and only about 200 feet from the crossing; that one of the trainmen came to his house the night that Robert Bolton was killed at the crossing and asked where he could get to the nearest telephone; that he told the trainman that he had a telephone in his house; and the trainman made the telephone call immediately. Bush stated that the trainman asked him to go out and identify the boys who were involved in the accident; that he told the trainman he could not do that, but he would get somebody who would go with him; and that he got Ed Roberts who lived in the house with him to go out and identify the bodies. Bush stated that he could see from his porch that there were seven or eight cars which had not cleared the crossing, that the caboose was just below the front of his house, back east. It had not passed over the crossing. He stated that the train was moved over the crossing sometime later. Bush's wife, Bertha, and Ed Roberts also testified as witnesses for the plaintiff in rebuttal, and their testimony was substantially the same as that of Bush. Roberts testified that Willie got him to go out to the crossing, and when he got out there the train had been cut in two parts, and part of the train had been pulled up north of the crossing. The caboose was South of the crossing. Roberts stated that the weather was foggy.

The trial judge, in his written opinion holding that the defendant's motion for judgment not withstanding the verdict should be sustained, referred specifically to the fact that the jury had accepted the testimony of the witness McMillan to the effect that the train had stopped and had been standing and blocking the highway crossing for something over five minutes at the time of the accident, and that the jury had found that the proximate cause of the accident and subsequent death of the plaintiff's intestate was the blocking of the highway. The trial judge stated that, in his opinion, if the oral testimony of the witness McMillan were all the evidence before the court, it might be treated as sufficient to withstand a motion for a directed verdict; but the photographs in evidence revealed no obstruction to the vision of the driver of an automobile at the point where the highway crossed the railroad track, and when the photographs were considered, together with the condition of the automobile in which the plaintiff's intestate was riding and the other physical facts, the only possible inference to be drawn from the physical facts was that the speed of the car in which the plaintiff's intestate was riding at the time of the accident was high, and that such physical facts were controlling. The trial judge cited in support of his conclusion on this point the case of Russell v. Mississippi Central R. R. Co., 239 Miss. 741, 125 So. 2d 283. The trial judge was of the opinion that the question of proximate cause was controlled by the cases of Gulf, Mobile & N. R. Co. v. Holifield, 152 Miss. 674, 120 So. 750; Spilman v. Gulf and S. I. R. Co., 173 Miss. 725, 163 So. 445; Gulf, M. & N. R. Co. v. Addkison, 189 Miss. 301, 194 So. 593; Mississippi Export Railroad Company v. Summers, 194 Miss. 179, 11 So. 2d 429; that the negligence of the railroad company in blocking the crossing for a period of more than five minutes in violation of the statute was not the effective cause of the accident; but the act of the driver

of the automobile was an intervening and independent proximate cause of the accident.

The trial judge in our opinion failed to evaluate properly the undisputed testimony of the witness Mc-Millan concerning the curve in the highway a short distance north of the railroad crossing and the photographic evidence which supported McMillan's testimony. The photographs themselves revealed the curve in the highway as it approached the railroad crossing; and it appears from the photographs that the lights of an approaching automobile could not be focused on an obstruction at the crossing until the automobile had rounded the curve. In that respect the facts in this case are entirely different from the facts in the Russell case, supra. The maps and photographs which were introduced in evidence in the Russell case showed that the Liberty road was straight for a distance of 700 feet, and that there was no abrupt dip sufficient to have any appreciable effect on the headlights of an automobile approaching the crossing from the east; and it was upon the basis of those facts that the court held that the testimony of the plaintiff's witnesses had to yield to evidence of the physical facts and, therefore, could not raise a jury question. It should also be noted that in the Russell case the record showed that the train had blocked the crossing for only a minute and a half and had stopped for only a half minute before the accident.

In 30A Am. Jur., 354, Judgments, Section 300, the textwriter says: ''In determining whether to render a judgment non obstante veredicto, the court is not justified in trespassing on the province of the jury to be the judges of all questions of fact in the case, and the party favored by the verdict is entitled to have the testimony read in the light most advantageous to him, and to be given the benefit of every inference of fact fairly deducible therefrom. Accordingly, an application for such judgment will be refused where there is evi-

dence tending to support the verdict, or where there is a conflict of evidence, so that the jury could properly decide either way, even though the conflict is such that the court would be justified in granting a new trial.'' In Grice v. Central Electric Power Assn., 230 Miss. 437, 92 So. 2d 837, the Court said: ''It is also unnecessary to cite the decisions supporting the well-established rule that in determining whether the defendant is entitled to a directed verdict, the evidence must be treated as proving every fact favorable to the plaintiff's case which is established either directly or by reasonable inference, among which cases are, however, those of Dean v. Brannon, 139 Miss. 312, 104 So. 173; Bankston v. Dumont, 205 Miss. 272, 38 So. 2d 721; Kurn v. Fondren, 189 Miss. 739, 198 So. 727; Stricklin v. Harvey, 181 Miss. 606, 179 So. 345; Johnston v. Canton Flying Service, 209 Miss. 226, 46 So. 2d 533. The same rule applies to a motion for a judgment notwithstanding the verdict.''

The appellee's attorneys in their brief contend that the accident which resulted in the death of the appellant's decedent was due solely to the negligence of the driver of the Plymouth automobile in which the appellant's decedent was riding, and that the negligence of the railroad company, if any, was relegated to a position of actual and legal remoteness; and as a basis of support for their contention on that point the appellee's attorneys rely mainly on the decisions of this Court in Gulf, Mobile and Northern Railroad Company v. Holifield, 152 Miss. 674, 120 So. 750, and Mississippi Export R. Company v. Summers, 194 Miss. 179, 11 So. 2d 429. In each of those cases the Court held as a matter of law that the conditions and circumstances disclosed by the record were not such as to impose liability upon the railroad company.

But the facts in each of those cases were entirely different from the facts in this case. In the Holifield case the accident occurred about eight o'clock at night

at a graveled street crossing in the City of Laurel; and the record showed that the street was straight for some distance in both directions from the railroad track. In the Summers case the accident occurred during the morning when the sun was about an hour high, but there was a dense fog which obstructed the vision of the driver of the truck. In the Holifield case the Court in its opinion said: "We are of the opinion that the employees of the appellant as reasonable men had the right to assume that, under all the circumstances shown by this record, the occupation of the crossing by these boxcars would be visible to a person who was driving along the street in an automobile properly equipped with lights, and who was keeping a constant lookout ahead, in time to allow such person to stop before coming into collision with the cars, and consequently that the proof in this case fails to show negligence on the part of the appellant." In its opinion in the Summers case the Court simply stated that the conditions at the crossing were not unusual and that the rule announced in the Holifield case was applicable. It can be readily seen that the conclusion reached in each of those cases was based upon a state of facts materially different from the facts in this case.

The courts have generally held that a railroad company, in the conduct of its ordinary business, has the right to stop its train across the highway and permit a car to remain thereon for a reasonable length of time; and if there are no unusual circumstances, it is not chargeable with negligence if guards are not stationed or lights or other signals are not placed so as to warn travelers on the highway of the presence of the train or car thereon. The rule is based upon the idea that the presence of the train or cars on the crossing is notice to a traveler on the highway, such as the driver of an automobile, of such obstruction, and that those in charge of the train have the right to assume, or are

justified in assuming, that one driving an automobile at night will have such lights and drive at such rate of speed as will enable him to see such an obstruction and avoid a collision. But the rule is not absolute and unqualified under all circumstances, and the railroad company may be found to be negligent in so stopping and standing its train or car on a highway crossing without giving some kind of warning to the travelers on the highway of the presence of the obstruction, if it is found that its employees in charge of the train, in the exercise of reasonable care, should have known that, on account of the darkness and other unusual circumstances, the train or car upon the crossing was such an obstruction that the operator of an automobile properly equipped with lights, driving at a reasonable rate of speed and exercising ordinary care for his safety, would be liable to collide with it. 44 Am. Jur. pp. 740, 741, Railroads, Sec. 501; St. Louis-San Francisco R. Co. v. Guthrie, 1927, 216 Ala. 613, 114 So. 215, 56 A.L.R. 1110; Hendrickson v. Union Pacific Railroad Company, 17 Wash. 2d 548, 136 P. 2d 438, 161 A.L.R. 96; See also Anno. 161 A.L.R. 111, and cases cited.

In St. Louis-San Francisco Railroad Co. v. Guthrie, supra, which was cited by this Court in its opinion in the Holifield case, and which has been cited with approval by many other courts during the last thirty years, the Court, in discussing the liability of a railroad company in a case of this kind, said: ''The rule sanctioned by the authorities * * * is that, in order to charge the railroad with negligence in such a case, it must be shown that defendant's employees in charge of the train, in the exercise of reasonable care, ought to know that on account of darkness the cars upon the crossing are such an obstruction that people traveling along the highway in automobiles properly equipped with lights and carefully operated at a reasonable rate of speed would be likely to come into collision with

them; in other words, the employees of the defendant, in the absence of some peculiar environment, are justified in believing that travelers in automobiles properly lighted and driving at reasonable speed will observe the cars upon the crossing in time to avoid coming into collision with them."

In Magers v. Okolona, Houston & Calhoun City Railroad Company, 174 Miss. 860, 165 So. 416; Illinois Central R. R. Company v. McNeil, 205 Miss. 807, 39 So. 2d 490; Boyd v. Illinois Central Railroad Company, 211 Miss. 409, 52 So. 2d 21, this Court has recognized the rule that, under ordinary conditions, the presence of a railroad train or car upon a crossing is adequate notice to a traveler approaching the crossing and the railroad employees need not give additional notice or warning of the danger; and that, in the absence of unusual circumstances, it is not ordinarily negligence to stop a train on a crossing without providing lights to warn users of the highway. In each of those cases, however, the court made it clear that there are exceptions to the rule thus stated, and that, where unusual conditions and circumstances prevail at the crossing, so that the railroad should anticipate that the mere presence of a train thereon will not adequately warn users of the highway, some additional warning may be required.

In Magers v. Okolona, Houston & Calhoun City Railroad Company, supra, the Court held that the questions of negligence and proximate cause were for the jury where it appeared that a highway curved sharply a short distance from the crossing; that there were no lights at the crossing; and that a dark gondola car had been left partially obstructing the street for thirty hours, with the intention of leaving it there until it was unloaded. The Court in its opinion in that case stated that the situation was one in which the railroad agents knew, or should have known, by the exercise of rea-

sonable caution, that there was a sharp curve in the public highway close to the crossing, where, if the motor vehicle were proceeding at a reasonable legal rate of speed, the time intervening in which the driver could see this partial blocking of the crossing was from two and a half to five seconds. The Court then said: "We think that even on a direct application of the Holifield case to the facts, the closeness of the curve to the parked gondola car, of which the railroad company had notice, or should have had, was a matter for the consideration of the jury, and that the court below erred in granting the peremptory instruction." The Court based its decision in that case on common law negligence, and not on the statute which prohibited the obstruction of a crossing for more than five minutes.

In Illinois Central Railroad Company v. McNeil, 205 Miss. 807, 39 So. 2d 490, the record showed that the plaintiff's automobile which was being driven by his minor son collided with a locomotive standing upon the main street crossing in the City of Forest. The locomotive was parked so as to obstruct the entire crossing except about 3 or 4 feet on the extreme east side thereof. The night was dark. No lights were burning on the engine, and no employee of the company was on or about the engine. It was completely abandoned and had been obstructing the crossing in that situation for at least fifteen minutes. The trial court submitted to the jury the question whether or not the company was guilty of negligence proximately contributing to the appellee's damage, and the jury found that issue against the company. This Court on appeal affirmed the judgment of the lower court.

In Boyd v. Illinois Central R. R. Co., 211 Miss. 409, 52 So. 2d 21, the Court held that a railroad company has the right to occupy a public crossing for its legitimate business purposes and without any warning thereof by lights or otherwise, unless the conditions and circum-

stances are such that the employees know, or in the exercise of reasonable caution should know, that a person carefully driving upon the highway at a reasonable rate of speed in a properly equipped automobile might not be able to see the cars in time to avoid a collision therewith; but, when the circumstances are such that the employees of the railroad company knew, or in the exercise of reasonable care should have known, that a motorist driving on the highway at a reasonable rate of speed in an automobile properly equipped with lights and brakes and carefully operated could not see or might not be able to see cars blocking a public crossing in time to avoid a collision, the question of negligence of the railroad is for determination of the jury. The Court in its opinion in that case said: ''In one or two of the cases cited by appellant it was stated that the presence of the car upon the crossing is all the notice which a traveler needs, but it must be at once apparent that such an expression has no application where the conditions and circumstances are such that reasonable care requires some further warning. If it were true that the mere obstruction of a crossing is sufficient notice that it is obstructed in each and every case, then there would never be any need for the exception and the exception would be a mere waste of words which are meaningless and of no avail in any case.''

Many other courts which have had occasion within recent years to consider the question as to the liability of a railroad company for injuries to motorists resulting from the obstruction of highway crossings by standing boxcars during the nighttime, have held that, where some special conditions or hazards to motorists exist at a railroad crossing if the crossing is blocked by a freight train at night, the railroad company may have the duty to provide special warning or safeguards notwithstanding the assumption that the motorist would use ordinary care; and in many such cases the courts

have held that, under the particular facts and circumstances involved, the question whether the company was guilty of negligence in failing to take precautionary measures, such as the posting of flagmen or of lights for the protection of the traveling public, was a question for the jury to decide. Richard v. Maine C. R. Co. (1933), 132 Maine 197, 168 A. 811; Myers v. Atlantic Coast Line R. Co. (1934), 172 S. C. 236, 173 S. E. 812; Spiers v. Atlantic Coast Line R. Co. (1935), 174 S. C. 508, 178 S. E. 136; Hendrickson v. Union Pacific R. Co. et al. (1934), 17 Wash. 2d 548, 136 P. 2d 439, 161 A.L.R. 96; Kneece v. Southern Ry. Co. (1938), 187 S. C. 195, 197 S. E. 673; Callaway v. Adams (1949), 252 Ala. 136, 40 So. 2d. 73; Albertson v. Wabash R. Co. et al. (1952), 363 Mo. 696, 253 S. W. 2d 184; Atlantic Coast Line R. Co. v. Johnston (Fla. 1954), 74 So. 2d 689; Padgett v. Central of Georgia Ry. Co. (1957), 95 Ga. App. 96, 96 S. E. 2d 658; Budkiewicz v. Elgin, Joliet & Eastern Railway Co. (Ind. 1958), 150 N. E. 2d 897.

In Callaway v. Adams (1949), 252 Ala. 136, 40 So. 2d 73, the Court had occasion to apply under a different set of facts the rule laid down by the same court in the Guthrie case, supra. The Callaway case was an action against the railroad company by the driver of a tractor and trailer to recover for damages sustained when he ran into a standing freight train which blocked a crossing at night. The Court held that the questions whether the railroad was negligent in obstructing the crossing and whether the driver was exercising reasonable diligence were questions for the jury on the conflicting evidence and inferences arising therefrom. The Court also held that the conclusion reached by the jury was not so out of harmony with the weight of the evidence as to justify the court's disturbing the jury's finding for the plaintiff. In that case the record showed that, in switching cars, the defendant's employees had left a freight train standing across and blocking the

highway where it remained unlighted, without guard or flagman, for a period of several minutes. The plaintiff's evidence showed that, by reason of the downgrade of the highway leading west toward the crossing, the lights on the motor vehicle traveling in that direction were focused only on the roadway until in the immediate vicinity of the crossing, at which point the highway made an abrupt upgrade and the lights then became focused on a view of the crossing. This was a situation with which the plaintiff was confronted immediately as he approached the crossing. The Court held that the railroad's requested instruction, that "after a train reaches a crossing and is standing thereon, the duty of a flagman or other mode of warning ends as to that particular train, * * * since the train standing on such crossing itself is then a sufficient warning," was properly refused.

In Albertson v. Wabash R. Co. et al. (1952), 363 Mo. 696, 253 S. W. 2d 184, the Court held that where a paved highway on a slight downgrade crossed at grade an unlighted, unguarded single-track railroad at the very edge of town approximately 360 feet beyond the four or five-track crossing of another railroad, whether the single-track crossing obstructed by a black oil tank car on a cloudy, foggy night was peculiarly hazardous, whether the railroad was therefore negligent in failing to take additional precautions for the safety of the traveling public, whether such negligence constituted a proximate cause of the collision, and whether the occupant of the automobile which collided with the tank car exercised due care for his own safety were questions for the jury.

In Atlantic Coast Line R. Co. v. Johnston (Fla. 1954), 74 So. 2d 689, the Court affirmed a judgment in favor of the plaintiff, a minor, against the railroad company for personal injuries sustained as a result of the automobile which the plaintiff was driving colliding with a

freight train which blocked the crossing of a public high-
way on the outskirts of the town of Eustis about 2:30
o'clock A. M., while the freight train with which the
automobile collided was on a routine pickup and the
crossing was fully occupied by it. The record showed
that the highway made a curve, some witnesses said
an "S" curve, across the center of which the railroad
passed and at which the accident took place. The Court
in affirming the judgment of the lower court in that
case said: "The driver of the automobile was negligent
in the manner in which he approached the crossing but
the appellant was negligent in the manner in which it
guarded the crossing. It was operating a special train,
it was dark and raining, the local environment was bad,
the road was frequently traveled and it had been blocked
four minutes at 2:20 A. M. It is common knowledge
that motorists now traverse the highways all times of
the day and night. In rural areas where town meets
the country, freight trains are not expected to block
the highway at two o'clock in the morning, uncovered
by a red light. Under such circumstances, if a highway
is to be blocked, ordinary prudence would require that
a flagman be placed so as to guard the crossing while
it is blocked. If not possible to do this much, certainly
flares or lights of some kind should have been placed to
warn travelers."

The appellee in the case that we have here obtained
an instruction that, if the jury believed from a prepond-
erance of the evidence "that the train was moving at
the time of the collision and then and there wholly
occupying the crossing, then and in that event and as a
matter of law the defendant was not required to main-
tain a flagman, warning signal, lights, barricade or
other warnings of said crossing." The appellee also
obtained an instruction "that the defendant had the
right to occupy the crossing for its business purposes,
and while so occupying the crossing it was not required

to maintain lights on its cars, or to stage a man with a lantern at the crossing to give warning that it was obstructed by the car, unless the conditions and circumstances were such that its employees knew, or in the exercise of reasonable care and caution should have known, that a person driving upon the street at a reasonable rate of speed in an automobile properly equipped with lights and carefully operated could not see or might not be able to see the car in time to avoid a collision therewith.''

The appellee also obtained an instruction that if the jury should find from the evidence ''that plaintiff's intestate knew or should have known that the crossing of Mississippi Highway 59 and the tracks of the defendant were occupied by trains then and there being operated by the defendant, then it was negligence for the plaintiff's intestate to undertake to cross such intersection; and if you find that such negligence, if any on the part of the plaintiff's intestate was the sole proximate cause of his injury and subsequent death, then it is your sworn duty to return a verdict for the defendant.''

The appellee, as stated above, requested a peremptory instruction directing the jury to return a verdict for the defendant. That instruction was refused. The issues presented by the pleadings and proof were submitted to the jury for their determination and the jury decided those issues in favor of the plaintiff. In his consideration of the appellee's motion for judgment notwithstanding the verdict the trial judge concluded that he had erred in refusing to grant the appellee's request for a peremptory instruction, and upon that basis sustained the motion for judgment notwithstanding the verdict. Under the authorities which we have cited, we think the requested instruction for a directed verdict was properly refused and that the court erred in sustaining the appellee's motion for judgment notwithstand-

ing the verdict. Johnston v. Canton Flying Services, Inc., 209 Miss. 226, 46 So. 2d 533; Grice v. Central Electric Power Assn., 230 Miss. 437, 92 So. 2d 837.

For the reasons stated above the judgment of the lower court is reversed, and a judgment will be entered here in favor of the plaintiff for the sum of $9,500, with interest at the legal rate of six per cent per annum from May 19, 1961, the date of the rendition of the judgment of the lower court.

Reversed and judgment rendered in favor of the appellant.

*Gillespie, McElroy, Rodgers,* and *Jones, JJ.,* concur.