MISSISSIPPI POWER & LIGHT COMPANY, et al. *v.* WALTERS

No. 42657 November 25, 1963 158 So. 2d 2

208

210

February 17, 1964 160 So. 2d 908

*Bethel Ferguson, Green, Green & Cheney, Wise, Smith & Carter,* Jackson; *William A. Huff,* Forest, for appellant, Mississippi Power & Light Company.

212

*Daniel, Coker & Horton,* Jackson; *O. B. Triplett, Jr.,* Forest, for appellant, Cities Service Oil Company.

*Forrest B. Jackson,* Jackson, for appellant, Larco Drilling Company.

*Bob Ray,* Jackson; *Roy N. Lee,* Forest, for appellee.

218

219

**KYLE, J.**

This case is before us on appeal by Mississippi Power & Light Company, a corporation, Cities Service Oil Company, a corporation, and Larco Drilling Company, a partnership composed of I. P. LaRue, Jr., and others, defendants in the court below, from a judgment of the Circuit Court of Scott County, Mississippi, rendered against the above named defendants in favor of W. R. Walters, plaintiff in the court below, in the amount of $25,000 as damages, for personal injuries alleged to have been sustained by the plaintiff on March 14, 1961, when he, as an employee of Luther McGill, Incorporated, was engaged in removing oil well equipment from an oil well site located in Simpson County, Mississippi.

The record shows that the injuries complained of were suffered as a result of an electric shock emanating from an electric power line owned and operated by Mississippi Power & Light Company at a time when the plaintiff was operating an "A-Frame" truck equipped with gin poles and a metal cable in close proximity to the power line. The defendants named in the plaintiff's declaration were as follows: (1) Mississippi Power & Light Company, a corporation hereinafter referred to as the "Power Company"; (2) Cities Service Oil Company, a corporation hereinafter referred to as "Cities Service" or the "Oil Company"; (3) Larco Drilling Company, a partnership composed of members of the LaRue family hereinafter referred to as "Larco"; and

(4) J. C. Bowman, d/b/a/ J. C. Bowman Trucking Company. During the course of the trial the plaintiff took a voluntary nonsuit as to J. C. Bowman.

The record shows that the oil and gas lease under which the oil well was drilled was a lease, covering lands in Simpson County, executed by C. M. Wells to Continental Oil Company on April 15, 1954, which had been assigned by Continental to Arkansas Fuel Oil Corporation by cross assignment dated September 2, 1958. The well drilling contract under which the well was drilled was a contract entered into between Arkansas Fuel Oil Company and Larco Drilling Company on September 30, 1960.

Arkansas Fuel Oil Company obtained the initial permit for authority to drill the well, to be known as Wells-Womack No. 1, from the State Oil and Gas Board on October 4, 1960; and immediately thereafter Larco procured the services of J. C. Bowman, a heavy hauler of oil field equipment, to haul the drilling rig and other machinery and equipment from the Gwinville Field, about 12 miles north of Prentiss, Mississippi to the well site selected by Arkansas Fuel Oil Company, which was situated immediately east of a public road running north and south four or five miles northeast of the Town of Magee. The site was approximately 200 feet in length and 150 feet in width. High-tension lines of Mississippi Power & Light Company were running in a northerly-southerly direction across the well site. The power lines had been erected in 1928, and were owned and operated by the defendant Power Company. The lines consisted of three wires bearing 13,800 volts of electricity. The wires were approximately 20 feet above the ground, and were uninsulated. The point selected for the drilling of the well was only about 75 feet east of the high-tension lines. The only means of access to the well site was an improvised roadway leading from the public road on the west to the well site and passing under the

high-tension lines. The equipment used in drilling the well and stored on the well site consisted of an oil well drilling rig and a great quantity of heavy machinery and pipe line equipment.

The drilling operations were begun on November 5, 1960. On December 2, 1960, Arkansas Fuel Oil Company conveyed its oil and gas properties to Cities Service Reserve, Incorporated; and on December 14, 1960, Cities Service Reserve conveyed the properties to Cities Service Oil Company. The well was completed on or about January 13, 1961. The well was drilled to a depth of 13,780 feet. It was a dual well producing oil from two horizons; and Larco, with the permission of Cities Service, had Bowman to disassemble and stack the rig and other drilling machinery and equipment on the well location under or in close proximity to the high-tension lines of the Power Company.

A few weeks after the well had been completed Larco made arrangements with Luther McGill, Inc., for the hauling of its drilling rig and equipment to a new drilling site near Merrit, several miles southeast of the Wells-Womack No. 1 well; and on March 10, 1961, Luther McGill's haulers appeared at the well site and began to load and move the equipment to the new drilling site in the Merrit Field. The appellee, Walters, and Alpha C. Dearman were employees of McGill. Walters operated an A-Frame truck equipped with a winch and a steel cable for hoisting and loading and drilling rig equipment and oil field supplies. The cable was fitted over a pulley at the top of the A-Frame, and attached to the end of the cable was a short chain, which was to be wrapped around and securely fastened to the piece of equipment which was to be picked up. Dearman was the swamper or helper and cableman who worked with Walters in the loading of the equipment.

The accident which resulted in Walters' injury and Dearman's death by electrocution occurred on March

14, 1961, while Walters and Dearman were undertaking to load a heavy piece of oil drilling equipment referred to in the record as a swivel, which had been stored under the high-tension lines of the Power Company when the drilling rig was disassembled by Bowman in January. The swivel was 8 feet or 8½ feet long, approximately 3 feet wide, and weighed approximately 4,000 pounds. Walters and Dearman were attempting to lift the swivel and place it on a truck which was being operated by Hubert Edwards. Walters' A-Frame truck was on the west side of the power lines. The tops of the gin poles on the A-Frame truck were approximately 19 feet from the ground; and, according to Walters' testimony, Walters backed the A-Frame truck toward the swivel and under Dearman's direction stopped the truck with his airbrakes when the gin poles were 3½ feet or 4 feet from the westernmost power line. Walters' right hand was on the airbrake. Dearman had hold of the winch line and hook. Dearman pulled the winch line toward him to unwind it from the winch drum so that he could hook the chain attached to the end of the cable around the swivel. When Dearman pulled the winch line toward him the third time a current of electricity passed from the power lines into the bodies of both workmen. Hubert Edwards, who was seated in the cab of his truck about 40 or 50 feet from Walters' gin pole truck, heard an outcry and went immediately to the scene of the accident. He found Dearman lying on the ground six or eight inches from the swivel. Walters had fallen to the ground outside of his truck. Both men were carried to the hospital immediately. Dearman was dead when the ambulance arrived at the hospital.

The plaintiff filed his declaration against the above named defendants on June 16, 1961. After stating the facts as outlined above, the plaintiff charged that each of the defendants knew, or by the exercise of ordinary care should have known, that the oil well drilling rig

and other heavy machinery and equipment were being disassembled and stacked under and in close proximity to the Power Company's high-tension lines; that the defendants knew, or in the exercise of ordinary care should have known, that in lifting and removing the heavy machinery and equipment under or in close proximity to the high-tension lines' long cranes, booms and gin poles would be required and would be used. The plaintiff further alleged that each of the defendants, in the exercise of ordinary care, should have foreseen and anticipated the danger of electrocution to which the plaintiff and others working under and in close proximity to the high-tension lines would be subjected while engaged in removing the heavy machinery and equipment from the oil well location; and that each of the defendants had carelessly and negligently failed to have a caution order in force, and had carelessly and negligently failed to place and make available a safety man to warn the work-men against the danger of electrocution.

Other specific charges of negligence were made against the several defendants, respectively, as follows:

(1) That the defendant Power Company was under the duty to use the highest degree of care in constructing, maintaining and operating its high-tension lines over the oil well area for the safety of the plaintiff and others who, while working in close proximity to the high-tension wires, might come in contact with the wires; that the defendant Power Company was grossly negligent in maintaining its high-tension lines charged with 14,000 volts of electricity too low over the oil well location for the safety of persons engaged in disassembling, stacking and removing the drilling rig and other oil well machinery and equipment; that the defendant Power Company, in the exercise of reasonable care, should have foreseen and anticipated the danger of electrocution to plaintiff and others working around,

under and in close proximity to its high-tension lines, and should have raised its lines to a safe height to avoid injury to the plaintiff and other workmen engaged in disassembling, stacking and removing the drilling rig and other heavy machinery and equipment under and in close proximity to the high-tension wires; and that the defendant Power Company negligently failed to raise its high-tension lines to a sufficient height to provide reasonable safety for the plaintiff and other persons working under and in close proximity to the high-tension lines.

(2) That the defendant Cities Service Oil Company had negligently selected and designated for the drilling of the oil well a highly dangerous location in too close proximity to the high-tension wires of the Power Company; and had negligently procured the services of the defendant Larco to drill the well on such highly dangerous location when it knew, or in the exercise of reasonable care should have known, that it would become necessary for the drilling company to assemble at the well site heavy machinery and equipment for the drilling of the well, and to disassemble the same upon the completion of the drilling operations, in such close proximity to the high-tension lines as to be highly dangerous to workmen engaged in the performance of such services.

(3) That the defendant Larco Drilling Company, upon completion of the drilling operations, had negligently caused the defendant J. C. Bowman to disassemble and stack the derrick and other heavy machinery and equipment used in the drilling operation under and in close proximity to the high-tension lines, and had negligently made arrangements with Luther McGill, Inc., to load and haul away the heavy machinery and equipment thus stacked under and in close proximity to the high-tension lines.

(4) That the defendant J. C. Bowman had negligently disassembled and stacked the drilling rig and other heavy machinery and equipment under and in close proximity to the high-tension lines.

In its answer the defendant Power Company denied all charges of negligence made against it in the plaintiff's declaration. The other defendants did likewise.

As matters of affirmative defense, the defendant Power Company alleged in its answer that the plaintiff's injury occurred upon a right of way owned by it and upon which it had erected its transmission system properly so that it was not thereby at fault; that it had continuously maintained its high-tension lines in a safe manner; and that no one had a right to trespass thereon. The defendant denied that it owed to plaintiff any duty other than such duty as it owed to a trespasser; and the defendant averred that its high-tension lines were constructed at a safe height. The defendant alleged that the plaintiff truck driver and his helper, Alpha C. Dearman, were employed by Luther McGill, Inc., an independent contractor, who was advised of the physical conditions obtaining at the well site; that the plaintiff and Dearman were engaged in a joint enterprise in operating the truck with the gin poles and equipment attached, around the oil well location where the accident occurred, and in so doing brought their machinery and equipment within eight feet of the Power Company's high-tension lines, in violation of Section 7015-11 through Section 7015-19, 1960 Supp., Miss. Code of 1942, Rec., and that the negligent action on the part of the two workmen brought about the accident in question. The defendant further alleged that the plaintiff had been warned of the danger attendant upon the operation in which he was engaged at the time of the accident and voluntarily assumed any risk which existed in performing the acts which he was performing at the time of his injury.

The defendant Cities Service Oil Company in its answer admitted that the rights of the Arkansas Fuel Oil Company in the drilling contract entered into with Larco in September 1960 had been transferred to Cities Service Oil Company; but the defendant averred in its answer that its rights had been transferred to Cities Service Petroleum Company as of January 1, 1961, and that the Cities Service Petroleum Company had been the operator of the well since January 1, 1961, for its owners. The defendant also averred that Dearman and Walters and Luther McGill, Inc., were only licensees at the well site to whom Cities Service owed no duty whatsoever except the duty owed to a trespasser.

The defendant J. C. Bowman in his answer denied that he was engaged in any business or activity in Simpson County on or about March 14, 1961, or that he was guilty of any negligence whatsoever which contributed to the plaintiff's injury.

The defendants I. P. LaRue and other members of the Larco Drilling Company partnership filed with their answer a motion for the change of venue to the First Judicial District of Hinds County, alleging as grounds therefor that they were individuals doing business as a partnership, that they were all adults and residents of the City of Jackson in the First Judicial District of Hinds County, and as individuals, by virtue of the provisions of Sections 1433-34, Miss. Code of 1942, they were suable only within the county and district of their domicile and residence. The court overruled the motion for a change of venue.

The case was tried at the March 1962 term of the court. At the conclusion of the rebuttal testimony of the plaintiff's witness, William Gill, the plaintiff requested permission to amend paragraph 5-B of his declaration to conform to the proof, so as to charge that the Power Company should have insulated its lines over the oil well location, and should have placed and

maintained a safety man at the well site while the oil well equipment was being removed for the safety of the plaintiff and other employees. Objection was made to the granting of the motion to amend, but the objection was overruled, and the proposed amendment was allowed. At the conclusion of all of the evidence the plaintiff took a voluntary nonsuit as to the defendant Bowman. Each of the other defendants requested an instruction for a directed verdict. The requested instructions for a directed verdict were refused, and the case was submitted to the jury for a determination of the issues presented by the pleadings. The jury returned a verdict for the plaintiff against the three defendants for the sum of $25,000. The Power Company thereupon filed a motion for judgment notwithstanding the verdict. The motion was overruled, and a judgment was then entered for the plaintiff against the defendants Power Company, Cities Service, and Larco for the amount stated in the verdict. Each of the defendants filed a motion for a new trial, and those motions were overruled. From the judgment entered against them the three defendants have prosecuted this appeal.

The three appellants have filed separate assignments of error as grounds for reversal of the judgment of the lower court.

The main points assigned and argued on behalf of the appellant Power Company as grounds for reversal of the judgment against the Power Company are: (1) That the court erred in refusing to grant the peremptory instruction requested by the Power Company at the close of all of the evidence; and (2) that the court erred in overruling the appellant's motion for judgment notwithstanding the verdict. Other points assigned and argued on behalf of the Power Company are: (a) That the court erred in allowing certain amendments to be made to the plaintiff's declaration; (b) that the court erred in permitting the cross-examination of Bethel

Ferguson, claims attorney of the Power Company, on privileged matters; (c) that the court erred in its ruling that the plaintiff's witness, H. M. Dennis, was qualified to testify as an expert electrician; and (d) that the amount of the verdict is so excessive as to evince bias and prejudice on the part of the jury, and the judgment should be set aside and a new trial granted for that reason.

The main points assigned and argued on behalf of the appellant, Cities Service Oil Company, as grounds for reversal of the judgment against it, are: (1) That the appellant was not a proper party to the suit, and the court should have granted the peremptory instruction requested by the appellant for that reason; (2) that, if the appellant was a proper party to the suit it owed no higher duty to the appellee than to refrain from willful and wanton injury to him, and there was no evidence of such injury. The main points assigned and argued on behalf of the appellant Larco Drilling Company as grounds for reversal of the judgment against it are: (1) That the court erred in overruling the appellant's motion for a change of venue filed at the time of the filing of the appellant's answer; and (2) that the court erred in refusing to grant the peremptory instruction requested by the appellant at the conclusion of all of the evidence. It is also contended on behalf of each of the appellants Cities Service and Larco that the amount of the verdict, upon the facts disclosed by the record, was so grossly excessive as to shock the conscience and evince bias and prejudice on the part of the jury, and for that reason the judgment should be reversed and a new trial granted.

It can be readily seen from the assignments of error noted above that the main questions presented for our decision on this appeal relate to the action of the trial court in refusing to grant the appellants' requested in-

structions for a directed verdict as to each of the three appellants.

■■■ This Court has held in a long line of decisions that, in determining the question whether or not the appellant was entitled to a directed verdict, the evidence must be treated as proving every fact favorable to the appellee's case which it established either directly or by reasonable inference. Dean v. Brannon (1925), 139 Miss. 312, 104 So. 175; Bourgeois v. Mississippi School Supply Co. (1924), 170 Miss. 310, 155 So. 209; Stricklin v. Harvey, 181 Miss. 606, 179 So. 345; Kurn v. Fondren, 189 Miss. 739, 198 So. 727; Bankston v. Dumont, 205 Miss. 272, 38 So. 2d 721; Johnston v. Canton Flying Services, 209 Miss. 226, 46 So. 2d 533. The same rule applies to a motion for a judgment notwithstanding the verdict. Grice v. Central Electric Power Ass'n. (1957), 230 Miss. 437, 92 So. 2d 837, 96 So. 2d 909; Green v. Gulf, Mobile & Ohio Railroad Co. (1962), 244 Miss. 211. 141 So. 2d 216. It is therefore necessary that we give a brief summary of the testimony upon which the jury based its verdict.

The record is a four-volume record. The evidence offered on behalf of the plaintiff to establish legal liability on the part of the defendants for the injury complained of may be summarized as follows:

A. J. Harris, Larco's foreman or tool pusher, who was called to testify as an adverse witness by the plaintiff, and who was later recalled to testify as a witness for the defendants, testified that he made the arrangement for the drilling rig to be brought to the Wells-Womack No. 1 drilling site in October 1960; that Clyde Stour, a representative of Arkansas Fuel Oil Company, accompanied him to the site and pointed out to him the place where the well was to be drilled. Harris stated that he then made arrangements with Bowman to move the equipment from the Gwinville Field in Simpson County, approximately 12 miles north of Pren-

tiss, to the new well site near Magee; that drilling operations were begun around the first of November, and the well was completed on January 13, 1961. Larco used a conventional derrick in drilling the well which was about 167 feet high. The area covered by the derreck floor was 30 x 30 feet. Harris stated that there was a public road running from Magee to the Wells-Womack well site and within approximately 200 feet of the point where the well pipe was put in the ground; and MP&L's power line was about half way between the producing oil well and the public road. He knew that the line was a high-powered line but he did not know how high.

Harris stated that when the well was finished he instructed Bowman to take the machinery and equipment apart and set it down on the drilling location out away from the well site. Bowman disassembled the machinery and equipment and put it where he was told to put it. He put the light stuff under the high power lines which ran across the west half of the drilling location, and he put the machinery and equipment close to the high power lines. The largest piece of machinery weighed about 75,000 pounds.

Harris stated that he made arrangements with Luther McGill, Inc., during the second week in March, to move the drilling rig and equipment from the Magee Field to the Merrit Field; and on March 10 he called Luther McGill's office in Laurel on the telephone and gave McGill's truck dispatcher instructions about moving the equipment. He told McGill's truck dispatcher that a high-tension line crossed the working area and extreme caution would have to be taken in moving the equipment, and the truck dispatcher should inform the truck drivers of that fact before they left the yard. Harris stated that he was at the well site when William Gill, McGill's truck pusher, arrived at the well site the next morning and he told Gill to warn his hands about the

power lines that were there, and to caution them to be careful and not let the trucks get into the lines. Two trucks arrived at the location about that time, and he cautioned the drivers about the power lines. Harris stated that he was at the well site around 7 or 7:30 the morning the accident occurred, but he left the well site to go to Merrit soon thereafter, and he was not at the well site at the time the plaintiff was injured.

Bethel Ferguson who had been identified by the Power Company's attorney as the representative of the Company in the trial of the case, and had been permitted to remain in the courtroom while other witnesses were being examined, was also called to testify as an adverse witness by the plaintiff. Ferguson stated that he went to the scene of the accident on March 15, the day after the accident occurred, and he saw the equipment which was stacked under the power lines. The swivel was on the bed of a truck. The general drilling area appeared to be about 150 by 200 feet. There was no insulation on the electric wires. On cross-examination by the attorney for Larco, Ferguson stated that J. W. Cavin was the Power Company's division manager in Jackson, and E. O. Robbins was the local manager at Magee. Robbins, elsewhere referred to in the record as ''Rip Robinson'', was the person who went with him to the scene of the accident and showed him where the place was. He was familiar with the area. Ferguson identified three photographs of the oil well site, which were offered in evidence by Larco's attorney.

Hubert Edwards, who was at the well site when Walters was injured, testified that he was employed by Luther McGill as a truck driver at the time the accident occurred. There were eight or ten workmen on the job. The drilling rig was scattered all over the well location, and it was necessary for him and the other workmen to pass under the wires from one side of the area to the other. He was told to be cautious of the power

lines, and he realized that the situation out there was dangerous. Edwards stated that he was present when Walters was injured and Dearman was killed around 9 o'clock A. M. His truck was sitting alongside the power line and Walters' gin pole truck was right behind it facing west, with the back of the truck and gin pole facing the power line. Walters had backed up toward the power line to pick up the swivel. The first thing that attracted Edwards' attention was that Walters hollered. Edwards went toward Walters' truck immediately, but before he got to him Walters fell to the ground. Dearman was lying on the ground beside the swivel. Walters' truck did not move from the time Edwards got out of his truck. The gin pole was approximately 3 or 4 feet from the high-tension line. Edwards stated that as a general rule the Company would not permit the workmen to drag equipment around on the ground, but as far as he knew no one had told the men not to drag the swivel. Edwards stated that Walters knew how to operate the type of truck that he was operating, and he knew that the electric current on the line was liable to burn or kill one who came in contact with it.

The plaintiff, W. R. Walters, testified that he was 44 years old; that he had been employed by Luther McGill, Inc., for 6½ years; that he had been working on Larco's drilling job at Magee four days and was loading out a truck at the time he was injured. McGill's foreman had told him that the wires were dangerous, and he and the other workmen stayed as far away from the wires as they could. If he had been unwilling to work in that dangerous situation, he would have been fired. The A-Frame poles on his truck extended about 18 feet above the ground. He had passed under the power lines that day with his truck two or three times. Walters was asked why he had the length of his A-Frame extended when he was lifting the swivel. His answer was that the only thing that he and Dear-

man could do there was to raise the equipment high enough to get it on the truck, and a short pole would not have enabled them to raise the swivel up high enough to get it on the truck. He was loading the equipment in the way that he was required to load it. Walters stated that his truck was headed west at the time of the accident. He had backed up to a point where the A-Frame was within three or four feet of the wire. He was keeping a lookout through the back glass; and when he brought his truck to a stop, Dearman pulled his winch line to hitch it on the swivel. Walters' right hand was on the brake of the truck at that time. Dearman pulled the winch line three times, and after he pulled it the third time he started back to the swivel, "and then everything went black."

Walters stated that after everything went black for him he did not know anything until the next day. He was carried to the Magee General Hospital and remained there three days. He was then carried to the Laurel General Hospital. He remained there three or four days, and was attended by Dr. Bass. He was later examined by Dr. Walter Neil of Jackson, a neurosurgeon, and a few days before the trial by Dr. L. W. Willey of Forest. Walters stated that the electrical shock burned his right hand and forearm, and he had still not recovered his strength in his right hand and arm at the time of the trial. He had also suffered continuous throbbing headaches as a result of the electrical shock. He had become extremely nervous and had experienced a partial loss of hearing. His ability to earn money had been seriously impaired.

On cross-examination Walters stated that he did not touch any of the power lines with his A-Frame. He stated that most of the time there was someone at the well site to tell him and Dearman exactly what to do and what to load, but no one was there to do that at the time the accident occurred. He admitted that the

swivel could have been raised a foot off of the ground and moved forward four or five feet. Walters stated that he had a sixth grade education, and the only thing he knew about electricity was that "they tell you it will kill you."

H. M. Dennis, an electrical contractor who lived at Forest in Scott County, testified that he had been an electrician for a period of 27 years, and although he had no college education, he had had wide experience as a practical electrician. Dennis testified that electricity was an unpredictable element; that it would react one way today and another way tomorrow, depending upon atmospheric and other conditions; that it was not necessary for a wire charged with electricity to come in direct contact with a metal object in order for the electric current to pass from the wire to the metal object; that the current would arc across; and the higher the voltage, the farther it would jump. Dennis stated that if a line charged with 13,800 volts of electricity came within 3½ to 4 feet of a metal object, particularly an A-Frame on a truck, the electricity in his opinion would arc or jump from the line over to the pole, and if it came in contact with the metal it would leave a mark on the wire or on the metal object that it arced to. Dennis was of the opinion that the electricity which injured the plaintiff and killed Dearman was electricity which arced across the wires to the gin pole or the metal cable attached to the gin pole.

Several witnesses were called to testify on behalf of the defendants.

J. B. Currie testified that he lived on the 40-acre tract of land adjoining the 40 acres on which the oil well was located. He had lived there during the last 19 years, and had cultivated the land in and around the power line across the two forties during that time. The power line at the time of the trial was just like it was when he moved there. But when the owners of the

oil lease were preparing the well bed for drilling operations they made some changes in the surface of the well site by putting in a fill right where the well was drilled. On cross-examination by the plaintiff's attorney Currie stated that the fill which was put in raised the elevation of the land where the well was drilled about 3½ feet. Currie stated that he obtained electric power from MP&L, and the Company's employees came to his home once a month to check the meter; they passed right by the well site and could see when the derrick was put up and when it was taken down and when the equipment was being moved and taken away. He stated that about four months elapsed between the time the drilling rig was installed and the time it was moved away in March 1961.

Clyde Anthony, civil engineer, who had been employed by the Power Company approximately 21 years, testified that he went to the well site on September 28, 1961, and took field notes to show the topograph of the oil well location, and with the aid of Mr. Jack Mashburn he located the place where the accident occurred. By the use of a surveyor's transit he was able to observe from his position on the ground the marks on the wires which indicated the points of contact of the gin poles with the wires. He found burns on all three wires. The measurements were made about 10:50 A.M. The temperature was 87° F. The distance from the surface of the ground to the lowest wire was 19.6 feet. He later went back on October 10, 1961. At 6:00 A.M. the temperature was 62.96° F. The distance from the ground to the lowest wire, which was the west wire, was 20.3 feet. The center wire was 20.8 feet from the ground, and the east wire was 20.4 feet from the ground. The wires were No. 4 solid copper, carrying a voltage of 13,800 volts. On cross-examination by the plaintiff's attorney Anthony stated that Rip Robinson, the local manager for the Power Company at Magee,

was also present when the measurement was made of the height of the wires above the ground. Anthony admitted that, if a man experienced in electricity had been stationed there to supervise Walters and Dearman, the accident might have been prevented. He stated that the power lines were patrolled periodically. He did not knew whether the Company knew that an oil well was being drilled out there. He admitted that the lines could have been raised if the Company had knowledge of the condition which existed.

Jack Mashburn, who worked for the Power Company as service man out of Jackson, testified that he went to the oil well site on September 28, 1961, with Clyde Anthony and Bethel Ferguson and Mr. Shelton Polk, and by operating a bucket truck, which was completely insulated, he raised himself up to the power lines so that he could examine the wires. He found pitting on all three of the wires. Mashburn exhibited to the jury and testified at length concerning gap devices used by power companies to prevent arcing when wires are struck by lightening. Mashburn stated that in his opinion it was not physically possible for electricity to arc over a distance of 3½ feet. John Gaddis, a civil engineer engaged in private practice, testified that he went to the oil well site on October 11, 1961, at the request of the chief engineer of the Power Company, and with the assistance of Mr. Shelton Polk and M. N. Grace, the Power Company's service man who worked out of Magee, made measurements of the elevation of the wires at points on the wires where pit marks or burns could be seen. The elevation of two of the wires were found to be 20.3 feet each. The elevation of the middle wire was 20.8 feet. The air temperature was 60.5 degrees Fahrenheit.

D. K. Smith, who had been employed by the Power Company for 35 years, testified that he visited the oil well site on October 5, 1961; that the particular circuit

on which the oil well was located had been under his supervision from 1945 to 1951; that during that period of time the parcel of land on which the oil well was located was a cornfield; and when he visited the oil well site in October 1961 he found that changes had been made in the surface of the ground for the purpose of locating the oil well. Smith testified that there were standards of construction which were generally recognized and followed in the electrical industry throughout the United States; that such standards of construction were set forth in the National Electrical Safety Code, published by the U. S. Department of Commerce, Bureau of Standards; and that the basic clearance prescribed by the National Electrical Safety Code for terrain which was accessible to vehicular traffic was 20 feet clearance at 60 degrees Fahrenheit. Smith stated that it was not customary in the electrical industry for power companies to insulate wires which carried a voltage of 13.8 K.V. He stated that 13,800 volts of electricity would not arc 3½ feet; that the maximum distance that such voltage would arc would be less than one inch. On cross-examination Smith admitted that the wires at the oil well location could have been elevated "for a fee" or the wires could have been insulated "for a cost". He stated that under certain conditions the Company could have placed a man out there to observe the lines and make sure that no one came in contact with them.

William Gill, Luther McGill's truck pusher or foreman, who was called to testify as a witness for the plaintiff in rebuttal, testified that he was not present at the well site at the time Walters was injured; but during the afternoon of March 14, the day the accident occurred, he made measurements of the distance from the top of the gin poles of the truck which Walters was operating to the ground and the distance was 19 feet. He found three or four pit burns or smoked places on the end of the gin poles. He inspected the poles again the next

day and could not find any burns. He knew that there was a high-powered line across the oil well location; and he had warned Walters and Dearman about the danger.

It is first argued on behalf of the appellant Power Company that the court erred in admitting the testimony of the plaintiff's witness, H. M. Dennis, an electrical contractor, who testified that in his opinion electricity was an unpredictable element, and it was not necessary for a wire charged with electricity to come into direct contact with a metal object in order for the current to pass between them; that an electric current would arc across from one piece of metal to another. It is argued that the testimony of the witness Dennis should be disregarded entirely for the reason that it was physically impossible for electricity to arc 3½ to 4 feet, as testified by the witness, and with the testimony of Dennis eliminated there is no basis for the verdict in the case.

We think there is no merit in that contention. Whether the gin pole or the metal cable came in contact with the electric wires, or whether the electricity arced or jumped from the power line over to the gin pole or metal cable, is not a matter of primary importance in this case. It is undisputed that Walters was injured and Dearman was killed as the result of the electric shock complained of in the plaintiff's declaration; and whether the electricity which entered Walters' body reached him by arcing from the Power Company's high-tension wires to the gin pole or cable, or as a result of a direct contact of the gin pole or cable with the power line, the liability of the Power Company would be the same. Rogers v. City of Chattanooga (1954), 39 Tenn. App. 176, 281 S.W. 2d 504; 4-County Electric Power Association v. Clardy, (1934), 221 Miss. 403, 73 So. 2d 144; Fairbairn v. American River Electric Co. (1918), 179 Cal. 157, 175 P. 637; Southwestern Gas

& Electric Co. v. Hutchins (1934 Tex. Civ. App.), 68 S. W. 2d 1085.

It is next argued on behalf of the Power Company that the Company's 13.8 K.V. power line was built in February and March of 1928, pursuant to a valid right of way agreement from the landowner; that the plaintiff at the time of the accident which resulted in his injury, was a trespasser upon the Company's property, and the only duty owed to the plaintiff by the Company was not to injure him wilfully and wantonly after discovering his position of peril; and the appellant's attorneys cited in support of their contention on that point the cases of McDonald v. Wilmut Gas & Oil Co. (1937), 180 Miss. 350, 176 So. 395, and Roberts v. Mississippi Power & Light Company, 193 Miss. 627, 10 So. 2d 542.

But we think there is no merit in that contention, and neither of the cases cited above, in our opinion, is decisive of any of the issues presented for our decision on this appeal. In the Wilmut Gas & Oil Company case the owner of an ox obtained an oral grant from a tenant of a right to pasture an ox on a parcel of swampy land. The ox was drowned in an uncovered pipe line ditch in which a pipe line had been laid by the Oil Company which owned the right of way across the land. The owner of the ox knew the condition of the ditch before he pastured the ox on the land. The court simply held that the owner of the ox assumed the risk of the animal being injured and had only himself to blame for the ox being drowned in the uncovered pipe line ditch. In the Roberts case a state highway employee was electrocuted as a result of coming in contact with the power line while using a long drilling auger to make oil tests along a proposed highway route, when the auger came in contact with an uninsulated power line about 13 feet from the ground on the Power Company's right of way through an open cultivated

field. The court held that the Power Company had no knowledge of the employee's presence on the right of way and was not liable for the employee's death. Whether that case was correctly decided or not the decision rendered is not controlling here.

 ██ The injury in the case that we have here did not occur on the Power Company's right of way over an open field, as in Roberts v. Mississippi Power & Light Co., supra, but on the well site of a producing oil well, which was plainly visible from a public highway and on which a drilling rig and other heavy oil well equipment had been located and men had been at work for a period of several weeks. There is ample evidence in the record to support a jury's finding that the Power Company knew, or by the exercise of reasonable care, should have known of the dangerous situation which existed at the well site as a result of the Company's continued maintenance of its uninsulated high-tension wires over the well site, where men were at work, at a height of only 20 feet above the ground.

In 29 C.J.S., pp. 580-583, Electricity, Sec. 42, it is said:

"One maintaining electric wires must so place them as to guard against contact of any nature, direct or indirect, that might ordinarily be anticipated. When the premises occupied by high voltage wires necessarily also have to be occupied by human beings in the performance of a lawful work, it becomes the duty of the electric company to remove such wires to a point where the human beings will not be likely to come in contact with them. * * * Where a company maintains electric wires at such a height that it has no reasonable cause to anticipate that people will come in dangerous proximity to them, it is not chargeable with negligence for failing to place them higher. The proper degree of care requires a greater precaution against injury from electric wires when so placed that persons are likely

to come in contact therewith than at more isolated points to which persons are not expected to resort.

"The duty of exercising care extends to every place where persons have a right to be, whether for business, convenience, or pleasure, and extends to those on the premises of consumers, and it makes no difference that the injury occurred on private property and not in a public highway if the person or animal injured had a right to be on such private property. The mere fact that there may be no contract relation between the parties does not change this principle."

In the case of Smith v. Appalachian Electric Power Co. (1935), 4th Cir. Crt. of App., 74 F. 2d 647, the Power Company contended that it owed no duty of care to the injured foreman or other employees of the operator of the Ferris wheel in question because the high voltage wire, though protected only by ordinary weather insulation, was safe when originally installed, and the dangerous situation, if any, was caused by the subsequent location of the Ferris wheel near the wire.

But the Court in its opinion said:

"We know of no principle of law which entitles the owner and operator of dangerous electric wires, merely by virtue of prior occupation, to insist that it may continue to maintain its wires in the same condition as if remote from human activity and threatening harm to no one, regardless of changes in the premises made by subsequent rightful occupants. On the contrary, the same contention that defendant now makes has been rejected by the courts in a number of decided cases * * *.

"We are in accord with the rule applied in these decisions, and are thus of opinion that an electric power company, maintaining its wires on private property, is bound to exercise due care when other occupants, in normal and rightful use of the premises, erect structures in proximity to its lines, in the event that persons rightfully in, on, or about such structures for work,

business, or pleasure, are thereby placed in a situation of danger, and the company knows, or with reasonable diligence ought to know, of the danger.

In the case of Walpole v. Tennessee Light & Power Company (1935), 19 Tenn. App. 352, 89 S.W. 2d 174, which was an action against an electric company for damages for personal injuries alleged to have been received when an iron pipe which the plaintiff was lifting from a well came into contact with the defendants' high-tension wires 23 feet and 1 inch from the ground over the well, the Court held that the question whether the placing of the high-tension wires only 23 feet and 1 inch from the ground at the well site was negligence was a question for the jury and was properly submitted to the jury. The Court in its opinion in that case said: " 'The degree of care required of one handling the dangerous agency of electricity depends upon the danger from the current, slight care being sufficient where the current would not injure persons with whom it came in contact, and the highest care being necessary where the current would be fatal to human life, as in the case of a high-tension wire in dangerous position.' Card v. Wenatchee Valley Gas & Electric Co., 77 Wash. 564, 137 P. 1047, 20 C.J. 343; Memphis Street Railway Co. v. Kartright, 110 Tenn. 277, 75 S.W. 719, 100 Am. St. Rep. 807; Nashville Railway & Light Co. v. White, 7 Tenn. Civ. App. 367; Bristol Telephone Co. v. Weaver, 146 Tenn. 511, 525, 243 S.W. 299."

The principal basis for determining liability of a power company for injuries resulting from contact between its wires and a crane or other movable machinery is the foreseeability of a situation arising which might lead to such injuries. If a reasonably prudent person in the position of the defendant should have anticipated danger to others from its installations, the defendant may be held liable. See Anno: Electric Power Company,

Liability, 69 A.L.R. 2d. 93, 104, and cases cited. This is so even though the exact situation that caused the injury may not have been reasonably foreseeable. Lozano v. Pacific Gas & Electric Co. (1945), 70 Cal. App. 2d 415, 161 P. 2d 74, infra, Sec. 5(e); Delta Electric Power Association v. Burton et al. (1961), 240 Miss. 209, 126 So. 2d 258. Many courts have held that where the circumstances are such that the probability of danger to persons having a right to be near an electric line is reasonably foreseeable, a power company may be held liable for injury or death resulting from contact between such a line and a crane or other movable machine. Anno. 69 A.L.R. 2d 104; Rogers v. Chattanooga (1954), 39 Tenn. App. 176, 281 S.W. 2d 504; Kingsport Utilities Inc. v. Brown (1955), 201 Tenn. 393, 299 S.W. 2d 656, 69 A.L.R. 2d 87; Alabama Power Co. v. Smith (1962), 273 Ala. 509, 142 So. 2d 228; Grice v. Central Electric Power Association (1957), 230 Miss. 437, 92 So. 2d 837; Galloway v. Singing River Power Ass'n., Inc., (Miss. 1963), 152 So. 2d 710.

In Delta Electric Power Ass'n. v. Burton, et al., supra, the plaintiff's wife had received fatal injuries from an electric shock resulting when a television antenna pole she was holding came in contact with a high voltage distribution line of the defendant Power Association. A judgment was rendered in favor of the surviving husband and children; and this Court, in affirming the judgment against the Power Association on direct appeal on the issue of legal liability, but reversing and remanding the case on cross appeal for a new trial on the issue of damages only, in its opinion said: "The proof showed almost without any dispute, and the jury was justified in finding, that the maintenance of the power lines in this case was unsafe. In our opinion the jury was fully justified in finding that appellant was charged with foreseeing that some injury would probably result from the maintenance of the power lines

as they were maintained in this instance. The rule is well settled that one charged with liability for negligence cannot escape liability because a particular injury could not be foreseen, if some injury ought reasonably to have been anticipated. Cumberland Tel. & Tel. Co. v. Woodham, 99 Miss. 318, 54 So. 890. Cf. Four-County Electric Power Ass'n. v. Clardy, supra, and Southern Pine Electric Power Assn. v. Denson, 214 Miss. 397, 57 So. 2d 859.'' In Galloway v. Singing River Electric Power Association, Inc., supra, the Court reaffirmed the principle stated in the Delta Electric Power Ass'n. case, that one charged with negligence is not relieved of liability because a particular injury could not be foreseen, if some injury ought reasonably to have been anticipated.

In Rogers v. Chattanooga, supra, a directed verdict for the defendant was held error, and the case was remanded for a new trial, where the record showed that the plaintiff's decedent was electrocuted while guiding a steel beam suspended from the boom of a crane when the crane came in contact with or close proximity to the defendant city's wire, which was 27 feet from the ground. The court held that there was ample evidence from which the jury might have found that the defendant, in maintaining the wire at that height in an industrial area, should have reasonably forseen that people would be working near or under the wire and that machinery similar to the crane in question might come in contact with the wire, particularly so since the city had issued a permit to build the original building, to build an annex, and to build another annex which was under construction when the decedent lost his life.

In Kingsport Utilities, Inc., v. Brown (1955), supra, the Court held that the question of negligence of an electric power company was properly submitted to the jury in an action by employees of the owner of heavy machinery which was being moved by a crane, the cable

of which arced or came in contact with the defendant's uninsulated electric power line strung on poles 25 feet above the surface of an alley, as a result of which the plaintiffs suffered electric shock and burns, where it appeared that the area involved was an expanding business section in which the use of machinery with tall booms was not uncommon.

In Alabama Power Company v. Smith (1962), supra, the Court held that a complaint charging negligence on the part of the electric company in maintaining high voltage uninsulated wires above the roof of a school wing being constructed, causing the death of a contractor's employee when the cable of the crane lifting concrete to be poured on the roof came in contact with the wires, and charging that the company had knowledge that the construction was being done in close proximity to the wires and that workmen on the construction project were in close proximity to the wires, stated a cause of action. In its opinion in that case the Court said: "For the reasons we have undertaken to show, we are of the opinion that the jury could infer that the Power Company, in exercise of care commensurate with the circumstances, was bound to anticipate the probable danger to workmen from the wires over the roof where Smith was injured, and that this duty rested on the power company even though it had no actual notice that a crane would be used."

The appellant's attorneys say, however, that even if the evidence in this case is treated as proving every fact favorable to the appellee's case which is established either directly or by reasonable inference, the proof was insufficient to show negligence on the part of the Power Company because of its failure to insulate its high-tension lines or because of its failure to elevate its lines over the oil well location, for the reason that the proof showed that the lines were constructed in full conformity with the requirements of the National

Electrical Safety Code, which had been approved as the standard of construction by the Mississippi Public Service Commission; that the wires had a basic clearance of approximately 20 feet, which was the minimum height prescribed by the National Electrical Safety Code for terrain accessible to vehicular traffic; and that there was no requirement in the Safety Code that distribution lines be insulated under the conditions which prevailed at the oil well site. And the appellant's attorneys cite in support of their contention on that point the cases of Tullier v. Gulf States Utilities Company (Dist. Ct. La. 1963), 212 Fd. Supp. 613, and Reed v. Duquesne Light Company (1946), 354 Pa. 325, 47 A. 2d 136.

But the decision of the court in each of those cases was based upon a state of facts entirely unlike the facts in the case that we have here. In the Tullier case the record showed that a billboard maintenance crew member was injured when a metal ladder held by him touched the power company's high voltage wire which passed overhead at a height of 32 feet. The complainant admitted that he knew the wires were there, but "just paid no attention to them." The Court held that this was negligence causing the accident and injuries complained of, and the complainant's demands were therefore denied. In the Reed v. Duquense Light Company case the record showed that the plaintiff's decedent was an employee of the American Bridge Company, who was killed on May 29, 1943. The high-tension lines involved in that case had been installed by the Light Company in May 1942 over the property of the Bridge Company on orders from the latter and for its service. When the lines were installed the Bridge Company specified the land over which they were run as an inactive area as indeed it was. The ground was waste land with no building or structure of any kind erected thereon and unused for any purpose. The high-tension

lines were elevated on poles at a height of 36 feet above the ground. The plaintiff's decedent was killed by electrocution on May 29, 1943, while helping to remove some telephone poles which were lying on the ground in close proximity to the power lines. The crane which was being used in removing the telephone poles was the property of the Bridge Company and under the control of its employees. There was no suggestion that the Light Company had actual knowledge of· the use being made by the Bridge Company of its land lying underneath the power line at the time the fatal accident occurred. The Court simply held that the facts in the case afforded ''no basis for fictionally imputing to the Light Company notice of the danger created by the cranes.''

 █ The fact that the appellant's power lines in this case had a basic clearance of approximately 20 feet at the time of the plaintiff's injury, which was the minimum height prescribed by the National Electrical Safety Code for terrain accessible to vehicular traffic, did not, in our opinion, necessarily indicate that the lines were so placed that the company would have no reasonable cause to anticipate that people working near or under the wires would come in dangerous proximity to them. Proof of compliance with the standards furnished by the National Electrical Safety Code was not conclusive on the question of due care by the Power Company. Actionable negligence may exist even though the utility involved has complied with the requirements of the Safety Code.

In Galloway v. Singing River Electric Power Association, Inc., supra, this Court held that a utility's compliance with the minimum safety requirements of the National Electrical Safety Code with respect to power lines relieves it of the charge of negligence per se, but compliance is not conclusive on the question of due care when the particular circumstances justify a finding of

lack of due care. In its opinion in that case the Court said: "The National Electrical Safety Code contains minimum requirements and constitutes guiding principles in the construction and maintenance of electric power lines. It is not conclusive on the question of due care by the utility. Compliance with the safety code is a relevant fact on the question of due care. If appellee had failed to comply with the minimum requirements of the National Electrical Safety Code it would probably be chargeable with negligence per se, and compliance relieves the utility of that charge. We hold that compliance with the minimum standards contained in the National Electric Safety Code is not conclusive on the question of due care when the particular circumstances justify a finding of lack of due care. Elliott v. Black River Electric Cooperative, 233 S.C. 233, 104 S.E. 2d 357, 74 A.L.R. 2d 907; Anno. 69 A.L.R. 127, et seq. Whether a utility is negligent despite compliance with the Safety Code is ordinarily a question for the jury. Johnson v. Monongahela Power Co. (W. Va.), 123 S.E. 2d 81."

In Kingsport Utilities, Inc. v. Brown, supra, a judgment for the plaintiff was upheld although it appeared that the original installation of the defendant's wires was in accordance with the National Electrical Safety Code, the court stating that the fact that the line when constructed was in accordance with the minimum standards of the electrical code did not necessarily indicate that it would be safe under changed conditions, and concluding that at least a question of fact about which reasonable men might differ was presented as to whether the utility was negligent in view of the growing nature of the area.

The courts in numerous cases have held the power company liable for damages on the theory that its uninsulated high-tension wires were not maintained at a sufficient height under all the circumstances. McGin-

nis v. Delaware, L. & W. R. C. (1922), 98 N.J.L. 160, 119 A. 163; Neumann v. Interstate Power Co. (1929), 179 Minn. 46, 228 N.W. 342; Mississippi Power & Light Co. v. Whitescarver (1934), (C.A. 5th Miss.), 68 F. 2d 928; Sandeen v. Willow River Power Co. (1934), 214 Wis. 166, 252 N.W. 706; Southwestern Gas & Electric Co. v. Hutchins (1934), Tex. Civ. App., 68 S.W. 2d 1085; Walpole v. Tennessee Light & Power Co. (1935), 19 Tenn. App. 352, 89 S.W. 2d 174; Lozano v. Pacific Gas & Electric Co. (1945), 70 Cal. App. 2d 415, 161 P. 2d 74; Chatfield v. New York State Gas & Electric Co. (1944 Supp.), 57 N.Y.S. 2d 406; Beck v. Monmouth Lumber Co. (1948), 137 N.J.L. 268, 59 A. 2d 400; Pike v. Consolidated Edison Co. (1951), 303 N.Y. 1, 99 N.E. 2d 885, revg. 277 App. Div. 1120, 10 N.Y.S. 2d 892; Northern Virginia Power Co. v. Bailey (1952), 194 Va. 464, 73 S.E. 2d 425; Southern Pine Electric Power Ass'n. v. Denson (1952), 214 Miss. 397, 57 So. 2d 859; Elliott v. Black River Electric Co-op. (1958), 233 S.C. 233, 104 S.E. 2d 357; Rogers v. Chattanooga (1954), supra; 4-County Electric Power Ass'n. v. Clardy, supra; Grice v. Central Electric Power Ass'n. (1957), supra.

In the case of Southern Pine Electric Power Ass'n. v. Denson, supra, this Court held that it was a question for the jury whether it was actionable negligence for the power company to string its uninsulated high voltage power line only 25 feet from the water well and within 3 to 6 feet of being immediately above the well hole, when as a result thereof the plaintiff's decedent was electrocuted in withdrawing the pump line from the well. The Court in that case said: ''Electricity is a highly dangerous agency, and it must be denominated negligence to erect so close to the well a high voltage line, unless insulated, or unless in the exercise of the highest degree of care, it was strung high enough off of the ground reasonably to prevent injury to him.'' In 4-County Electric Power Association v. Clardy, supra,

which was an action for damages for personal injuries sustained by the plaintiff, a well driller and repairer, as a result of the plaintiff coming in contact with the defendant Power Association's high voltage lines, the Court held that the evidence was sufficient to sustain a finding that the defendant had been negligent in constructing and maintaining its lines almost directly over a drilled well and only 25 feet from the ground.

In 18 Am. Jur. p. 486, Electricity, Sec. 93, it is said: "The rule that persons controlling so dangerous and subtle an agency as electricity should not be permitted to theorize in regard to its probable effects or speculate upon the chances of results affecting human life is only in accord with reason and common sense. The wires must be either insulated or placed beyond the danger line of contact with persons going where they may reasonably be expected to go. While the maintenance of electric wires should not be burdened with excessive liabilities, still it seems clear that a company maintaining dangerous wires should not be relieved on the ground of expense from the affirmative duty of exercising a reasonable degree of care to maintain proper insulation and thereby prevent accidents reasonably to be apprehended to those lawfully coming in the neighborhood of such wires."

In view of the deadly character of the powerful current of electricity carried on the appellant's wires which were suspended over the oil well location at a height of only 20 feet above the ground, we think the jury had a right to find that the appellant should have forseen and anticipated occurrences of the nature here involved. We also think that under all the circumstances the question of the appellant's negligence was one for the jury and could not be determined as a matter of law, and there was no error in the trial judge's refusal to grant the peremptory instruction requested by the appellant Power Company.

Finally, it is argued on behalf of the appellant Power Company that Walters had been warned of the dangers attendant upon working around the lines in question, and that Walters' negligence in failing to heed such warnings, and the negligence of Walters and his co-employee Dearman and his employer Luther McGill, was the sole proximate cause of the accident; that the plaintiff would have sustained no injury if Luther McGill and Walters and Dearman had not violated the provisions of Ch. 257, Gen. Laws of Miss. 1960 (Code Section 7015-11 through 7015-19, 1960 Supp. Miss. Code of 1942, Rec.), entitled "An Act to provide the precautions to be taken in proximity of high voltage lines for the prevention of accidents;" and to provide penalties for the violation of the act.

But it is well-settled by the decisions of this Court that there may be more than one proximate cause of an injury; and that, if the appellant's negligence proximately contributed to the injury, the appellant is liable even though its negligence is not the sole proximate cause of the injury.

In the case of American Creosote Works of La. v. Harp (1952), 215 Miss. 5, 60 So. 2d 514, the Court said: "In this connection appellant further argues that its negligence was not a proximate cause of appellee's injury but that the sole proximate cause thereof was his own negligence in cutting the bands across the top of the load which held the standards together. There may be more than one proximate cause of an injury. 38 Am. Jur., Negligence, Sec. 63, and if appellant's negligence proximately contributed to the injury, as the jury has found that it did, then appellant is liable even though its negligence was not the sole proximate cause thereof. Brewer v. Town of Lucedale, 189 Miss. 374, 198 So. 42; Gulf Refining Co. v. Brown, 196 Miss. 131, 16 So. 2d 765; Planters Wholesale Grocery v. Kincade, 210 Miss. 712, 50 So. 2d 578. Moreover, when reasonable

minds might differ on the matter, the question of what is the proximate cause of an injury is usually a question for the jury, 65 C.J.S., Negligence, Sec. 264, and likewise questions of negligence and contributory negligence are generally for the determination of a jury.''

In Four-County Electric Power Ass'n. v. Clardy, supra, the Court held that, whether under the facts and circumstances outlined in the opinion the appellee was negligent, and whether such negligence, if any, was a proximate or contributory cause of the appellee's injury, and, if so, the extent to which it affected the appellant's liability, were issues for the jury. The Court also held that, whether there was an independent, intervening cause of the appellee's injuries, wholly disconnected from and having no causal relation to the appellants' negligence, was a question which was properly submitted to the jury.

In Grice v. Central Electric Power Ass'n., supra, where a highway worker was killed when the boom on a dragline came in contact with the defendant's wire, the Court, in reversing a judgment for the defendant and reinstating a verdict for the plaintiff, rejected the trial court's conclusion that the act of the boom operator in swinging the boom against the wire and the act of the decedent in undertaking to get on the truck while the boom was on or among the high-voltage wires constituted an intervening and independent cause of the accident, stating that such acts did not absolve the defendant of its negligence, at least as a contributing cause of the accident.

In the case of Kingsport Utilities, Inc., v. Brown, supra, judgments against the power company for five plaintiffs, injured while assisting in removing heavy machinery from a machine shop into an alley when the cable of a crane came either in contact with or in close proximity to the defendant's high-powered wires, were upheld even though it was shown that the boom of the

crane had been raised 10 feet higher than the wire, and the machinery being moved was on the opposite side of the wire from the crane, and the crane owner was found clearly negligent and liable in the same action; and the defense of intervening efficient cause was rejected. It was held that by reason of the fact that the area where the plaintiffs were injured was an expanding business section the Power Company should have known of numerous cases involving the use of booms and heavy machinery, and knew or should have known that with its wires uninsulated an accident similar to the one in question might result, and accordingly the jury could reasonably have found that the defendant should have foreseen the probability of such an accident happening.

It is not necessary that we discuss at length the provisions of Ch. 257, Laws of 1960, referred to above. The statute in our opinion does not change the rule that persons operating electrical systems transmitting deadly currents of electricity are required to exercise the highest degree of care in their construction and maintenance. The statute in our opinion was not enacted for the purpose of relieving the Power Company from its duty to exercise due care to place its high-tension wires a sufficient distance above the ground to guard against contact of any nature directly or indirectly that might ordinarily be anticipated. The precautionary measures prescribed in the act are prescribed especially for the protection of workmen who, in the performance of lawful work on premises occupied by high-tension wires, may be exposed to the dangers incident to the performance of the work assigned to them. That fact is clearly indicated by the provisions of Section 3 of the act, that, "No person shall require or permit any employee to do any of the things prohibited in Section 2 above."

The premises where the plaintiff was injured were premises where men had been at work for a period

of several weeks. Massive machinery and oil well equipment still remained on the premises awaiting removal to a new well site. There is ample evidence in the record to support the jury's finding that the Power Company, in the exercise of due care, should have foreseen that booms or cranes or A-Frame trucks similar to the A-Frame truck which was being operated by Walters and Dearman would be used in moving the equipment to another well site. With these facts in mind the jury had a right to conclude that the Power Company was negligent in failing to elevate its wires to a greater height above the ground at the well site; and the fact that Luther McGill, Inc., the plaintiff's employer, and the owner of the A-Frame truck, or its agent or other person responsible for the operation of the equipment, failed to station a man experienced in electricity at the well site to supervise Walters and Dearman in the loading of the equipment, and failed to post and maintain in plain view of the operator on the truck a durable warning sign, as specified in the above mentioned statute, did not, in our opinion, relieve the Power Company of liability for its negligent failure to elevate its wires at the well location to a height above the ground commensurate with the dangerous situation which existed at the well location.

▇▇ ▇ We think there is no merit in the appellant's contention that, since the plaintiff had been warned of the danger of coming in contact with the power lines, the plaintiff assumed the risk of being electrocuted by coming in contact with the wires and was therefore barred of his right to recover against the Power Company. This Court held in Cumberland Tel. and Tel. Co. v. Coshahan et al. (1913), 105 Miss. 615, 62 So. 824, that where a telephone company and an electric light company were both negligent in permitting their wires to come in contact and a lineman employed by the telephone company was killed in repairing the trouble, the

fact that the lineman assumed the risk as an incident to his employment with the telephone company did not operate as an assumption of such risk as to the electric light company, nor prevent a recovery against such electric light company. The Court also held in that case that no contributory negligence, whether simple or gross, if negligence can be thus classified, will bar a recovery, but will simply cause a diminution of the amount thereof.

 Whether the plaintiff himself was guilty of contributory negligence in permitting the gin pole or cable of the A-Frame truck to come in contact with the high-tension wires was a question of fact to be determined by the jury. While the proof shows that the plaintiff knew of the location of the power line and knew that he had to exercise care to prevent the gin pole and cable from coming in contact with it, it cannot be said as a matter of law that the plaintiff was negligent in permitting the gin pole or cable to come in contact with the wires. The testimony shows without dispute that the truck had passed under the wires several times without incident; and according to the plaintiff's testimony, the gin poles and cable did not come closer to the wire than three or four feet, although the testimony of the Power Company was to the effect that the electricity could not jump over a distance of more than a half inch. Under these circumstances the question as to the plaintiff's contributory negligence was a jury juestion; and even if the jury had found that the plaintiff was guilty of contributory negligence such contributory negligence would not have been a complete bar to recovery. Section 1454, Code of 1942, Rec. Such contributory negligence under our statute would have resulted only in the diminution of the amount of damages which the plaintiff otherwise would have been entitled to recover.

It is not necessary that we discuss in detail the other points assigned and argued by the appellant Power

Company as grounds for reversal of the judgment of the lower court.

There was no error in the action of the trial judge in allowing two amendments to be made to the plaintiff's declaration. The first amendment was an amendment allowed at the beginning of the trial, which charged that, as a result of the electrical shock complained of the plaintiff sustained permanent damage to the nerve and membrane of his right ear and a change in personality due to the shock. The second amendment, which was allowed at the conclusion of the rebuttal testimony of the plaintiff's witness William Gill, charged that the Power Company should have insulated its high tension lines over the work area for the protection of the plaintiff and other employees while the equipment was being removed.

Section 1511, Code of 1942, Rec., expressly provides that the court shall have full power to allow amendments to be made in any pleading or proceeding at any time before the verdict, so as to bring the merits of the controversy between the parties fairly to trial. The above mentioned amendments in our opinion were properly allowed, and there is nothing in the record to indicate that the appellant was prejudiced in any way by the action of the court in allowing the amendments.

There is no merit in the appellant's contention that the court erred in permitting the cross-examination of Bethel Ferguson, a representative of the Power Company who, in company with E. O. Robinson, inspected the scene of the accident the day after the accident occurred.

We also think that reversible error cannot be predicated upon the statements made by the trial judge in explanation of his action in overruling the appellant Power Company's continuing objection to and motion to exclude the testimony of the plaintiff's witness H. M. Dennis, whose competency to testify as an expert

witness on the subject of electricity, was vigorously challenged by the appellant. The record shows that the witness was questioned at length as to his knowledge of electricity and his competency to testify as an expert witness. The court excluded that part of the witness' testimony relating to a book he stated that he had read on the subject of electricity but later found that he was unable to produce. The court overruled the appellant's motion to exclude all of the witness' testimony. In overruling the appellant's motion to exclude all of the witness' testimony, the Court said: "I think that he is qualified as an expert person who is superior, skilled in his trade, his avocation. * * * One does not have to know all there is to know about a subject in order to be an expert, and he does not have to be the smartest man in this field. I think from this witness' testimony, with 27 years experience working with electricity, he has acquired skill in his trade, his avocation. I think he is qualified."

The statement of the trial judge, in our opinion, was not a comment on the weight of the witness' testimony, but a mere statement of the basis for the Court's ruling that the witness was qualified under established rules of law to testify as an expert on the subject of electricity. This Court has held in at least two cases that a witness need not be infallible or possess the highest degree of skill to testify as an expert; that it is generally sufficient that the witness possess knowledge peculiar to the matters involved and not likely to be possessed by ordinary laymen. King v. King, 161 Miss. 51, 134 So. 827; Glens Falls Insurance Co. v. Linwood Elevator, 241 Miss. 400, 130 So. 2d 262. This Court has also held that it is largely within the discretion of the trial judge as to whether or not a witness will be permitted to testify as an expert. Glens Falls Insurance Co. v. Linwood Elevator, supra. We think that it cannot be said that the statement of the trial judge giving his reason

for overruling the appellant's motion to exclude the testimony of the witness Dennis was prejudicial to the rights of the appellant.

The last point assigned and argued on behalf of the Power Company as ground for reversal of the judgment of the lower court is, that the amount of the verdict is so excessive in view of the nature of the plaintiff's injuries as to evince bias and prejudice on the part of the jury, and the judgment should be set aside and a new trial granted for that reason. We think there is merit in that contention.

The record shows that the plaintiff was admitted to the Magee General Hospital immediately after receiving the electric shock and was examined and treated by Dr. J. O. Stephens. He remained in the hospital at Magee two days. He was then transferred to Laurel and was under the care of Dr. Bass. He was later examined by Dr. Walter Neill, a neurosurgeon of Jackson. Dr. Stephens testified that the plaintiff was quite upset when he was admitted to the hospital at Magee, that he was complaining of pain in his right arm and hand, but positive physical findings were confined to redness of the right hand and forearm. The doctor stated that he kept the plaintiff in the hospital 48 hours. He did not know what his condition was after he left the Magee Hospital. On cross-examination Dr. Stephens testified that the burns on the plaintiff's right hand and forearm were first degree burns without any obvious blisters; and in a case of an electric burn it is impossible to determine the depth of the burn during the first few days immediately following the burn. He stated that the plaintiff's nerves had quieted down, but he was still complaining of some numbness in his right hand and forearm, when he left the hospital. Neither Dr. Bass nor Dr. Neill was called to testify as a witness during the trial.

Dr. L. W. Willey, of Forest, testified that he examined the plaintiff on Tuesday before the trial at the request of the plaintiff's attorney. He gave the plaintiff a complete physical and neurological examination. The doctor stated that the plaintiff gave him a history of his injury at the oil well site. The plaintiff told him that he was unconscious for several hours after receiving the electric shock and he did not know what was going on or where he was until the following day. He stated that after he left the Magee Hospital he was under the care of Dr. Bass three or four days, and that he was later examined by Dr. Walter Neill of Jackson. He stated that he had suffered continuously from headaches since his accident; that he had been restless and had been unable to get along with his family as well as he did prior to the accident; that he was cross and irritable, and did not like to be in crowds; that people made him nervous, and that caused his headaches to be worse; that previous to the accident he had never noticed any such disturbances. The doctor stated that during his examination of the plaintiff he discovered that the plaintiff had an air deafness in his right ear which the plaintiff did not know that he had until the doctor discovered it, and further examination revealed that the ear drum on the right ear was not there; but the doctor could not swear that the injury to the ear was a result of the electric shock. With reference to the plaintiff's nervous condition, the doctor stated that it appeared to him, from what the plaintiff told him, that there was some nervous involvement. The doctor was of the opinion that, as a result of abnormal electric stimuli to the nervous system, the plaintiff was suffering a personality change due to the electric shock, and that in time might clear up entirely. The doctor also felt that in all probability the plaintiff's headaches were due to the electric shock and in time should improve. On cross-examination the doctor stated that his find-

ings, including his statement to the effect that the plaintiff had experienced a personality change, were based on what the plaintiff related to him concerning himself.

Dr. Stephens was later recalled for further examination, and in answer to questions propounded to him by the appellants' attorneys Dr. Stephens stated that the plaintiff was never unconscious at any time that he saw him during the two days he spent in the Magee Hospital. The doctor also stated that when he examined the plaintiff he found no difficulty with the plaintiff's eyes, and the plaintiff had an ear drum in his right ear at the time he examined him.

██ ██ In our opinion the amount of the verdict, in view of the nature of the injuries complained of and the medical testimony, is grossly excessive, so excessive in fact as to require a reversal of the judgment against the Power Company and the granting of a new trial, unless the appellee agrees to enter a remittitur of $10,-000. If the appellee agrees to enter a remittitur in that amount within twenty days from the date of the judgment of this Court, the judgment of the lower court against the Power Company will be affirmed for $15,-000; otherwise the judgment against the Power Company will be reversed and the case remanded for a new trial on the issue of damages only.

██ ██ We think the appellee's proof was insufficient to establish liability against Cities Service Oil Company, the owner of the oil lease along with the easement rights incident to the ownership of the lease. Cities Service owned the easement rights in the oil well location but did not own or control the power line, and had no interest in the drilling rig and equipment which McGill's haulers were engaged in moving from the Wells-Womack No. 1 well site to the drilling site in the Merrit field. The drilling rig and equipment were owned by Larco. The status of Larco, whose drilling rig and equipment were stored on the well location with the permission

of Cities Service, was that of a mere licensee and, in our opinion, Cities Service owed no duty to Luther McGill, Inc., and its employees, who were engaged in loading and hauling the drilling rig and equipment for Larco, other than the duty which a landowner owes to a licensee.

It is settled law that the owner or occupant of land or premises owes no duty to a licensee entering upon the premises, except not to harm him willfully or wantonly. 38 Am. Jur. 765, Negligence, Sec. 104; Kelley v. Sportsman's Speedway, 224 Miss. 632, 80 So. 2d 785; Bishop v. Stewart, 234 Miss. 409, 106 So. 899.

In Kelley v. Sportsman's Speedway, supra, the Court defined the status of a licensee as follows: ''A license is broadly defined as a person who enters upon the property of another for his own convenience, pleasure or benefit. In order to constitute the person so entering a licensee, his entrance upon the property of another must be pursuant to the license or implied permission of the owner. 38 Am. Jur. 765, Negligence, par. 104. '* * * Ordinarily, a licensee who chooses to remain on premises where danger is patent takes on himself all natural and probable results of the danger, whether it results from a condition in the land or in appliances thereon, and whether the licensee is a gratuitous licensee or one who has paid for the privilege of entering upon the premises.' 38 Am. Jur. page 769, Negligence, Par. 105.''

In the recent case of Bishop v. Stewart (1958), 234 Miss. 409, 106 So. 2d 899, this Court affirmed the judgment of the circuit court sustaining the defendant's demurrer in a suit filed against persons who had stored several truck loads of steel pipe on a portion of another's premises with his permission, and the plaintiff fell over the stacked pipe. The gist of the holding was that the plaintiff was under the circumstances as to the defendant, a licensee only, and as such, the defendant owed

to her no more than a duty not to willfully and wantonly injure her. There was no allegation of willful and wanton injury in that case, nor can there be any basis for such allegation in the present case. Inasmuch as Cities Service was the lawful occupant of that portion of the lot used in storing the pipe and other equipment, it was entitled to invoke the rule that it owed no duty to a licensee except not to harm him willfully and wantonly.

██ ██ We also think the appellee's proof was insufficient to establish liability against the appellant Larco Drilling Company, the owner of the drilling rig and other machinery and equipment which was being removed by Luther McGill, Inc., from the Wells-Womack No. 1 well site to a new well site at Merrit.

Luther McGill, Inc., was a public hauler and an independent contractor engaged in loading and hauling heavy oil field equipment, machinery and supplies. Luther McGill owned trucks, gin poles, cables and other equipment needed for the loading and hauling of such heavy equipment and supplies, and had its own crews of workmen and its own supervisory personnel to handle its hauling operations. Larco had engaged the services of Luther McGill for the removal of its drilling rig and other oil well machinery and equipment from the Wells-Womack No. 1 well site, to the new drilling site in the Merritt Field. The record shows that on March 10 Larco's foreman or tool pusher called McGill's office in the City of Laurel on the telephone and gave McGill's truck dispatcher instructions about moving the equipment, and told McGill's truck dispatcher that a high-tension line crossed the working area at the Wells-Womack No. 1 well site and extreme caution would have to be taken in moving the equipment, and the truck dispatcher should inform the truck drivers of that fact before they left the yard. Harris then went to the well site the following morning and told McGill's

truck pusher that he should warn his hands about the power lines that were there.

"An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." Rest. Agency, Sec. 2, pars. 2 and 3, p. 11; Texas Company v. Mills, 171 Miss. 231, 156 So. 866, 869; Gulf Coast Motor Express Co., Inc., v. Diggs, 174 Miss. 650, 165 So. 292; Meridian Taxicab Co., Inc., v. Ward, 184 Miss. 499, 186 So. 636; Carr v. Crabtree, 212 Miss. 656, 55 So. 2d 408.

■■ The general rule is that an employer is not liable for the torts of an independent contractor or the latter's servants; Gulf Coast Motor Express Co., Inc., v. Diggs, supra; 27 Am. Jur. 504, Independent Contractors, Sec. 27 and cases cited; except under certain circumstances which do not exist in this case, as for example, where the employer assumes control or direction of the method of performing the work. So far as the record shows neither McGill's truck pusher nor any other employees of McGill were under the control of Larco, or subject to any right of control by Larco with respect to their physical conduct in the performance of the undertaking, or the method of performing the work. Under these circumstances we think there was no liability on the part of Larco for any negligence of Luther McGill, Inc., or its servants, which may have contributed to the plaintiff's injuries.

For the reasons which we have stated in this opinion the judgment of the lower court will be affirmed as to the appellant Power Company on the issue of liability, but reversed on the issue as to the amount of damages and a new trial granted on that issue only, unless the appellee, within twenty days from the date of the judgment rendered by this Court, agrees to enter a remittitur of $10,000, thereby reducing the amount of the judgment

to $15,000, in which event the judgment will be affirmed as to the appellant Power Company for the sum of $15,000. The judgment of the lower court will be reversed as to the appellants Cities Service Oil Company and Larco Drilling Company, and judgment will be entered here in favor of those two appellants.

Affirmed with remittitur as to the appellant Power Company, and reversed and judgment rendered in favor of the appellants Cities Service Oil Company, Inc., and Larco Drilling Company.

All Justices concur, except McGehee, C. J., who dissents, and Lee, P. J., who took no part.

McGehee, C. J., dissenting in part:

The test of liability in this case was whether or not the appellants Mississippi Power & Light Company, Cities Service Oil Company, and The Larco Drilling Company were negligent in connection with the injury complained of by the appellee W. R. Walters, and whether or not the accident was reasonably foreseeable. We all agree that the verdict of the jury was erroneous in finding all three of these appellants guilty of negligence which proximately caused the injury to the plaintiff Walters, and in assessing his damages at the sum of $25,000 against all three of them.

We find no basis for the verdict insofar as the Cities Service Oil Company and the Larco Drilling Company are concerned. The writer of this opinion alone thinks that the judgment appealed from is erroneous also as to the appellant Mississippi Power & Light Company.

As to whether the accident and the injury to the plaintiff was reasonably foreseeable or not, the record discloses that during the year 1928 the appellant Mississippi Power & Light Company acquired a right of way across the field and woods of its grantors in Simpson County, Mississippi. The question is whether or not the said appellant should have reasonably foreseen that approximately 33 years thereafter the owners of

the land from which the said appellant was acquiring its right of way, might some day sell all or a part of the minerals under the land and that the purchaser of the minerals might some day obtain from the State Oil & Gas Board a permit to drill an oil well on the particular strip of land covered by the right of way; that the said purchaser of the minerals would some day employ a drilling company to drill a well on the location of the right of way; that the drilling company might then haul machinery and equipment for the drilling of a well to and store the same on the 150 by 200 foot well site; that among the machinery and equipment so stored on the right of way would be an A-Frame some 12 or more feet high, and weighing approximately 4,000 pounds, which had been stored on the right of way for only about four days time prior to the accident, and had reason to believe that the drilling company in loading the said machinery and equipment on trucks to be hauled to another well site would cause the plaintiff, an employee of the Luther McGill, Inc., which is not a party to this suit, to be injured by an electric shock resulting from a contact of the said A-Frame with the high tension wires of the appellant Mississippi Power & Light Company located a distance of 55 feet away and between 19.6 and 20.6 feet above the ground. I therefore dissent from the affirmance of the $25,000 judgment as to the Mississippi Power & Light Company based upon this theory of alleged reasonable foreseeability, but I concur in requiring a remittitur of $10,000 from the judgment as against the appellant Mississippi Power & Light Company to be entered here.

Moreover, the plaintiff was shown to have been repeatedly warned of the danger and he repeatedly admitted that he had received such warning not to contact the high tension wires, and he admitted that he knew that they were dangerous. In this state the doctrine of the assumption of risk is still in full force and effect,

except as between master and servant. There was no such relationship between the plaintiff, W. R. Walters, and the appellant Mississippi Power & Light Company, and none such is contended for.

The appellees rely strongly on the cases of Southern Pine Electric Power Assn. v. Denson, 214 Miss. 397, 57 So. 2d 859, and Grice v. Central Electric Power Assn., 230 Miss. 437, 92 So. 2d 837, but I think that these two cases are readily distinguishable on the factual situation from the case at bar in that in the Denson case, supra, the electric power association acquired a right of way over the land of Mr. and Mrs. E. J. Stringer, the appellee's decedents. Mr. Stringer already had a well in his backyard, and the electric power association erected its high tension wires directly over the said well. There was constructed around the curb of the well a platform 3 or 4 feet high, on which Mr. Stringer was standing at the time of the accident, and he pulled out of the well a piece of pipe 24 feet in length to clean out the strainer point thereof. He caused the piece of pipe to come in contact with the high tension wires directly above the well and he was instantly electrocuted. Thereupon Mrs. Stringer ran to his assistance and she was likewise electrocuted.

The negligence of the electric power association in that case consisted of its placing its wires directly over a well which had already been located in the backyard, and the power company should have reasonably forseen that in cleaning out the strainer point at the end of the pipe it would likely occur that the pipe would be brought into contact with the high tension wires which were then and there approximately 20 feet above the ground.

In the Grice case, supra, a highway was being relocated and reconstructed from the village of Sebastopol to the City of Forest, and the highway was being elevated by the construction of a dirt fill several feet high underneath the high tension wires of the Central Elec-

tric Power Association. Thereupon Grice stepped on the running board of the truck to which a boom was attached, and this boom came in contact with the high tension wire above, with the result that Grice was shocked and badly burned. Under all the facts and circumstances the power company should have reasonably foreseen that because of the elevation of the highway the boom on the truck would easily be brought into contact with the high tension wires above, and that injury would result to the workmen. In other words, I am of the opinion that the two foregoing cases are readily distinguishable on their facts and are controlled by different principles of law.

Moreover, in the Grice case, there was an electric light pole of the Power Association left in the embankment at a sharp curve in the dirt fill above mentioned, and this light pole was so located that the high tension wires hung directly over the highway and the dirt fill on which the truck and boom were located were brought much closer to the high tension wires than they had been theretofore. I think that this condition made it reasonably foreseeable that with this light pole in the embankment of the sharp curve of the highway such an accident would likely occur.

## ON MOTION TO CORRECT JUDGMENT

KYLE, P. J.:

The lower court rendered a judgment in this case on March 10, 1962, in favor of the appellee W. R. Walters against the appellant Mississippi Power & Light Company and its two codefendants, Cities Service Oil Company and Larco Drilling Company, for the sum of $25,000. This Court on November 25, 1963, affirmed the judgment of the lower court as to the appellant Mississippi Power & Light Company on condition that the appellee enter a remittitur of $10,000, thus reducing the judgment to $15,000. The appellee entered a re-

mittitur, and a judgment was thereupon entered against the Mississippi Power & Light Company and the United States Fidelity and Guaranty Company as surety on its supersedeas bond, for the sum of $15,000. The judgment of the lower court was reversed as to the appellant Cities Service Oil Company and Larco Drilling Company, and judgment was entered here in favor of those two appellants.

A motion has been filed by the appellee W. R. Walters to correct the final judgment rendered herein against the appellant, Mississippi Power & Light Company, so as to provide that the judgment for $15,000 shall bear interest from the date of the judgment of the lower court, and so as to provide that the costs of appeal to this Court be taxed one-half to the appellee W. R. Walters, and one-half to the appellant Mississippi Power & Light Company and its surety.

Since the filing of the above mentioned motion to correct judgment, the attorneys for the appellant Mississippi Power & Light Company and the attorneys for the appellee W. R. Walters have filed with the Clerk of this Court an agreement in writing for the entry of a corrected judgment whereby the appellee W. R. Walters shall have and recover interest on the $15,000 judgment affirmed by this Court from the date of the rendition of the judgment of the lower court, and whereby the costs of the appeal shall be taxed one-half to the appellee W. R. Walters and one-half to the appellant Mississippi Power & Light Company and its surety.

The motion of the appellee to correct judgment will therefore be sustained, and the judgment of this Court rendered on November 25, 1963, affirming the judgment of the lower court, after the entry of a remittitur, against the appellant Mississippi Power & Light Company and the surety on its supersedeas appeal bond will be amended and corrected so as to provide

for the recovery by the appellee of $15,000, together with interest thereon in the amount of $1,712.50; and the costs of this appeal shall be divided equally between the appellee and the appellant. See Illinois Central Railroad Company et al. v. Nelson (1963), 245 Miss. 395, 148 So. 2d 712.

The judgment of this Court reversing the judgment of the lower court as to the appellants Cities Service Oil Company and Larco Drilling Company, and awarding judgment in favor of those two appellants will be reaffirmed.

Motion to correct judgment sustained.

All Justices concur except Lee, C. J., who took no part.